### SCHOFIELD v. STATE NAT. BANK OF DENVER, COLO.

(Circuit Court of Appeals, Eighth Circuit. October 9, 1899.)

No. 1,157.

1. CONTRACT — CONSTRUCTION — AGREEMENT BY BANK TO ASSUME LIABILITIES OF ANOTHER.

Two banks entered into a contract by which one agreed to assume and pay the liabilities of the other, in consideration of which the latter transferred to the former its office furniture and cash assets, and assigned to a trustee for collection a certain amount of its bills receivable, selected by the other bank; the proceeds to be paid to such other bank until it should be reimbursed the amount it should be required to pay out. *Held* that, the evident and expressed purpose of such contract being to relieve the debtor bank from its liabilities, no implied promise on its part could arise therefrom to repay to the other bank any amount it might be required to pay out in excess of the value of the property transferred and the proceeds of the assets assigned, especially where a supplemental agreement, made some two months later, clearly showed that a contrary construction was placed upon the contract by the parties themselves.

2. ACTION FOR MONEY PAID—GROUNDS—AGREEMENT TO PAY NOT PERFORMED.

It is not enough to sustain an action for money paid out and expended for the use of defendant that plaintiff has agreed to expend it, where he has not done so, and has become insolvent.

3. NATIONAL BANKS—POWERS—VALIDITY OF CONTRACT.

A contract by a national bank to assume and pay the liabilities of another bank in consideration of the transfer to it by the other bank of its office furniture and lease and its cash and cash assets, and the further assignment to a trustee for its benefit of bills receivable and securities, is not ultra vires, but is within its powers conferred by statute to conduct a general banking business.

4. SAME—ADVERSE INTEREST OF DIRECTOR.

The fact that a director of a national bank, whose presence was necessary to constitute a quorum at a meeting where by the action of the directors, in which he participated, a contract by the bank to assume and pay the liabilities of another bank was ratified, was also a stockholder in such other bank, in the absence of any allegation of fraud in the transaction, is not sufficient to render the contract invalid.

In Error to the Circuit Court of the United States for the District of Colorado.

William C. Cochran (Earl M. Cranston, Robert J. Pitkin, and William A. Moore, on the brief), for plaintiff in error.

Joel F. Vaile (Edward O. Wolcott, Elroy N. Clark, and Charles H. Toll, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The writ of error in this case challenges a judgment which sustained a general demurrer to a complaint made by the plaintiff in error, John W. Schofield, as receiver of the Union National Bank of Denver, Colo., against the State National Bank of that city. Each of these banks was organized and was doing business under the national banking law in June, 1894, in the city of Denver. The complaint disclosed these facts:

On June 23, 1894, negotiations were pending between the two banks for an assumption by the Union Bank of the indebtedness of the State Bank in consideration of a transfer by the latter to the Union Bank of such a part of its live assets as would be sufficient to secure the Union Bank for paying the debts of the State Bank. On that day R. W. Woodbury, the president of the Union Bank, wrote to John L. McNeil, the president of the State Bank, that it had been impossible for him to make such a personal examination of the paper of the latter bank as would justify him in closing the transaction, but added:

"Now, if your people are disposed to secure us by your entire assets until we can be satisfied in the selection of paper, to reimburse us for the assumption of your liabilities, I will undertake to call our board together to-night at some hour, and let the transfer be announced in the morning papers."

This letter was submitted to the board of directors of the State Bank on that day, and that board passed a resolution to the effect that its president and cashier should contract to sell its office furniture, fixtures, safes, vault, and stationery to the Union Bank for $15,000, and to assign and transfer to that bank sufficient of the bills receivable, moneys, and other assets of the State Bank to se-

cure the Union Bank for its payment of the debts of the State Bank to its depositors, and for borrowed money, in consideration of an agreement by the Union Bank to pay these debts, and in consideration of its obtaining a release of the State Bank from its obligations under a certain lease to one McClintock. Thereupon the Union Bank took possession of the office, furniture, and money of the State Bank on the next day; and on June 25, 1894, the board of directors of the Union Bank approved and adopted the letter of Woodbury, and authorized the president and cashier of its bank "to carry into effect the proposed assumption of the business of the latter [the State Bank], on the general basis of paying its deposit and borrowed-money liabilities, and receiving therefor cash and exchange and good paper and furniture and fixtures sufficient to meet the same." The board of directors of the Union Bank then assumed the liabilities of the State Bank to its depositors, to other banks, to the Denver Clearing House, and to the holders of its certificates and bills payable, and proceeded to pay them as payment was demanded. The liabilities of the State Bank were $560,641.64. It had $30,987.78 in cash, and $21,815.78 in checks in transit and accounts receivable from other banks, which it immediately delivered to the Union Bank; and it had bills receivable, mortgages, and real estate of the face value of $809,446.80, but the actual value of this part of its assets was less. On July 28, 1894, the stockholders of the State Bank ratified and approved the action of its board of directors, but the stockholders of the Union Bank took no action in the premises. On July 12, 1894, three of the directors of the Union Bank resigned, and John L. McNeil, the president, and two of the directors of the State Bank, each of whom was more interested in that bank than in the Union Bank, were elected directors of the latter bank, and thereafter acted as such. In August, 1894, an agreement, which was evidenced by resolutions passed by the boards of directors of the two banks, was made in the performance of the contract of June, 1894, and it was to this effect: The Union Bank assumed the payment of $31,300, for which the State Bank was liable on certain rediscounts, and covenanted that it would not make or assert any claim or liability against the State Bank or its stockholders beyond the assigned assets. The State Bank agreed to assign to John L. McNeil, as trustee, bills receivable, to be selected by the Union Bank, to the amount of $564,000 at their face value, as security for the payments made and to be made by that bank in performance of the June agreement. The two banks agreed that the Union Bank might select the rediscounted bills as a part of this security; that it might take any of the bills receivable at their full amount in part payment of its claim; that when it paid the indebtedness of the State Bank to the Mercantile National Bank and the National Park Bank of New York, if it did so within 15 days, the trustee should turn over all the assigned securities to the Union Bank; that while he held them the trustee should collect the securities as fast as possible, and pay $500 per month out of the proceeds thereof to the president of the State Bank in satisfaction of the expenses of its liquidation; that he should pay over the balance to the Union Bank; and that if, in

the end, the property which the Union Bank received from the State Bank produced more than the former expended in payment of the debts of the latter, the surplus should be returned to the State Bank. When the resolution of the board of directors of the Union Bank which bound it to this agreement was adopted, only six members of the board were present, and McNeil was one of them, and his presence was necessary to constitute a quorum. The agreement was performed. Bills receivable which belonged to the State Bank to the amount of $564,000 at their face value were selected by the Union Bank, and assigned to McNeil as trustee, and he proceeded to collect them, and to apply the proceeds pursuant to the contract. Both the State Bank and the Union Bank became insolvent, and receivers of their property were appointed, who succeeded McNeil as trustee, and discharged his duties; and at the time of the commencement of this action the plaintiff, Schofield, as receiver of the Union Bank, had come into the possession of the uncollected balance of the assigned securities, which amounted at their face value to $279,552.95. The amount collected from these securities and paid over to the Union Bank or its receiver was $278,233.41. That bank had also received in cash, checks in transit, and in amounts due from other banks, in June, 1894, $52,803.56, and the indebtedness of the State Bank which it assumed was $560,641.64; so that, without regard to interest, it assumed an indebtedness which exceeded the amount it has realized from the property of the State Bank assigned to secure it, by the sum of $229,604.67.

Upon this state of facts, the plaintiff, as receiver of the Union Bank, offers to return the uncollected securities which he holds, and asks for a judgment against the State Bank for the difference between the amount of the debts of that bank which the Union Bank assumed and the amount which the Union Bank has realized from the assets which the State Bank delivered to it and to the trustee. The court below was unable to discover any ground for charging the State Bank with this liability, and dismissed the action.

It is not claimed that there is any express stipulation or provision in the agreement between the banks to the effect that the State Bank shall repay the money which the Union Bank has expended on account of the debts of the State Bank. But the contention is that such a contract must be implied, because that agreement provided that certain of the bills receivable of the State Bank should be assigned to the Union Bank and to the trustee to secure the reimbursement of moneys which the Union Bank expended in paying these debts. But an agreement in direct conflict with the terms of an express contract cannot be implied from such a contract. An implication may not contradict and destroy an express stipulation. The letter and the resolutions of June 23 and June 25, 1894, which constitute the original contract, strongly indicate that it was the purpose of the parties to that agreement not to charge the State Bank with any liability, but to relieve it and its stockholders of all liability for its debts. It is improbable that the State Bank insisted so strenuously upon an express agreement from the Union Bank to assume its debts, and agreed to turn over to the latter bank all

its valuable assets to secure it from loss in the performance of that contract, without a clear intention and understanding between the parties that the performance of this contract would leave the State Bank free from liability, not only to its creditors, but also to the Union Bank. This, it seems to us, is the fair construction and true meaning of the letter and resolutions of June, taken by themselves. If, however, there were any doubt that this is their true construction, it would be removed by the interpretation which the parties themselves placed upon the contract when they agreed upon the details and the manner of its performance in the following August. More than 40 days after this contract was made, and while it was in the course of performance, the two banks met, and agreed upon a method of carrying out and completing it. They put their agreement in writing, in the form of resolutions adopted by the boards of directors of the two banks. The State Bank then inserted in the resolution of its board of directors which authorized and directed the assignment of the securities to the trustee these words:

"It is further understood, and it is a condition of this resolution, that the Union National Bank, in consideration of the benefits derived by it from the arrangement between said Union Bank and said State National Bank, will not make or assert any claim or liability against or upon the part of said State National Bank of Denver, or its stockholders, beyond the said assigned assets."

And the board of directors of the Union Bank passed a resolution accepting this resolution of the State Bank, and the condition which it contains. When the language used by the parties to a contract is ambiguous or of doubtful meaning, the practical interpretation given to it by the parties themselves when engaged in the performance of the agreement, and before any controversy has arisen concerning it, is one of the best indications of its true intent. Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057; Chicago v. Sheldon, 9 Wall. 50, 54. The express terms of the contracts between the banks forbid the implication that the State Bank agreed to pay to the Union Bank any part of the debts which the latter assumed.

Another position of counsel for the plaintiff in error is that the contract was ultra vires of the Union Bank, that the moneys it expended under it were paid for the use of the State Bank, and that consequently there is an implied contract by the latter bank to pay back the balance above the amount which the Union Bank has obtained from the assigned assets as money had and received by the State Bank for its own use. There are many fatal objections to this theory, but we shall notice but two. One objection is that the Union Bank does not allege in its complaint that it has ever paid out or expended any balance. It does not aver that it has paid on account of the debts of the State Bank any more than it has collected from its assets. It does allege that it has assumed and agreed to pay more, and that it has become insolvent. But it cannot recover of the State Bank for money paid out and expended for the use of the latter until it pays out and expends it. It is not enough to sustain a cause of action for money paid out and expended for the use of a defendant that the plaintiff has agreed to expend it, but has never

done so, and has become insolvent, so that he probably never can do so.

Another fatal objection to the argument of counsel here is that there was nothing in the contract beyond the powers of the Union National Bank, and therefore there is no foundation for a cause of action for the money it has expended in accordance with the terms of its contract. This agreement required the Union Bank to do nothing which national banks are not authorized to do,—nothing which they do not do in the conduct of the ordinary business of banking. That bank was empowered "to exercise by its board of directors, or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of this title." Rev. St. § 5136. What did the Union National Bank do here that was not within the powers conferred upon it by the national banking act? It bought the furniture and fixtures of a banking office for $15,000, assumed the lease of a building in which this office was situated, and proceeded to occupy and use it to operate its bank. But it was empowered to do this by section 5137 of the Revised Statutes. It received from the State Bank $30,987.78 in cash, and $21,815.78 in checks in transit and accounts receivable from other banks. It had express authority to receive these amounts as deposits, and by the purchase of the furniture and the receipt of these sums it became indebted to the State Bank in the sum of $67,803.56. In the absence of an express contract, it would have been bound to pay this amount to the State Bank or to its order; and, if the latter bank directed it to pay this sum to its creditors, it was legally bound to make the payment in that way. It could not have been in excess of the powers of the Union Bank for it to expressly agree to do that which it was bound to do under the law without an agreement. This, however, was not all that it did. It agreed to loan $492,838.08 (the amount above the $67,803.56 required to pay the debts of the State Bank), and to pay the debts of the State Bank with this amount; and it agreed to make this loan upon the personal security of the makers and indorsers of bills receivable of the face value of $564,000, which it selected, and which the State Bank assigned in trust to secure the repayment of the loan, and it promised to turn back to the State Bank any sur plus of these securities or of their proceeds which remained after it had been reimbursed for this loan. Let us analyze this transaction for a moment, and see if there is anything here beyond the powers of a national bank. A simple illustration seems to make this matter clear. A. has a promissory note for $10,000, payable to his order, made by two responsible parties, and due in 90 days. He owes a promissory note of $9,000, due in 60 days. He takes the former note to a national bank, indorses it without recourse, discounts it, and walks off with the proceeds. No one can successfully question the power of such a bank to loan its money on the

security of such a promissory note, or its authority to discount or to buy the paper. Auten v. Bank, 19 Sup. Ct. 628, 635; Smith v. Bank, 26 Ohio St. 141, 151. But suppose A. leaves the proceeds of the note on deposit in the bank to his credit until his note for $9,000 falls due. He may then draw his check on the bank for the $9,000 payable to the creditor, and draw his check for the balance of the proceeds payable to himself, and the bank is legally liable to pay both checks; and this although the makers of the $10,000 note may have become insolvent, and their note may have become worthless, since it was discounted. Nor would there be anything ultra vires of the bank if, when A. discounts the note, the bank expressly agrees with him to do the very thing which at his request it is legally bound to do on account of its discount or purchase of the note; that is to say, to pay his note of $9,000, and to pay him the balance of the proceeds of the $10,000 note. Much less would it be beyond its powers to agree to pay the $9,000 and the surplus it should realize from the $10,000 note only. But this was all there was in the agreement which the plaintiff in error challenges. It is true that the Union Bank loaned its money on more than one promissory note, but, if it could lawfully loan it on one, it could do so on two or many. It is true that it did not place the proceeds of the bills receivable which it obtained as security to the credit of the State Bank; that it did not take possession of the bills receivable, but left them in the hands of a trustee; and that it was not bound to pay to or on account of the State Bank any more than the amount of the latter's debts, unless it realized more than that amount from the securities. But these provisions of the contract serve only to bring it further within the powers of the bank than a simple discount or purchase of the paper. Under such a discount or purchase all the proceeds of the discount of the entire purchase price are immediately payable, while under this contract only $492,838.08 was absolutely payable on account of bills receivable of the face value of $564,000, and more was payable only in case it was realized from the securities. The whole is greater than any of its parts, and includes them all; and the power which a national bank undoubtedly has to discount or purchase commercial paper, and to pay for it immediately, necessarily includes the power to agree upon the amount of the proceeds of the discount or the amount of the purchase price, to loan money upon the security of the paper, instead of discounting or purchasing it outright, and to contract to pay out the money agreed to be loaned at some future time, instead of at the time when the agreement is made. There is nothing ultra vires of the Union Bank in the contract or transaction in issue. U. S. Nat. Bank of New York v. First Nat. Bank, 49 U. S. App. 67, 73, 24 C. C. A. 597, 600, 601, 79 Fed. 296, 300; Bank v. Sharp, 6 How. 301, 322, 323; Bank v. Smith's Ex'r, 40 U. S. App. 690, 23 C. C. A. 80, 77 Fed. 129; Bank of Genesee v. Pachtin Bank, 13 N. Y. 309; Marvine v. Hymers, 12 N. Y. 223; Houghton v. Bank, 26 Wis. 663; West St. Louis Sav. Bank v. Shawnee Co. Bank, 95 U. S. 557, 559; Cooper v. Curtis, 30 Me. 488, 490; Davenport v. Stone, 104 Mich. 521, 62 N. W. 722.

The same considerations which have led to the decision that the agreement in question and its performance were within the ordinary powers of a national bank dispose of the objection that the board of directors had no authority to make the contract.

It is insisted that the agreement of August was void, because the Union Bank received no consideration for it, while it released the State Bank from liability to repay the money which the Union Bank expended in paying the debts of the State Bank, allowed the latter bank $500 per month for the expenses of its liquidation, placed the assigned securities in the hands of a trustee, and not in the possession of the Union Bank, required the Union Bank to assume an additional burden of indebtedness not covered by the original agreement (the $31,300 for which the State Bank was liable on its rediscounts), and limited the amount of the securities assigned to $564,000; and because John L. McNeil, who was the trustee, the president of, and more largely interested in the State Bank than in the Union Bank, was one of the board of directors of the latter bank, necessary to a quorum, when the resolution of that board which assented to the agreement was adopted. The agreement between the parties, however, was made in June. For more than 40 days the performance of this agreement had continued. The contract of August was then made. It was a supplemental agreement. It was made and executed in part performance of the June contract. It was nothing more than the arrangement of the details, the specification of the manner of the performance of the original agreement. Consequently it did not require a separate and independent consideration to make its stipulations binding. There was ample consideration in the mutual covenants of the original agreement for all the subsequent acts that were done and all the later contracts that were made in the course of its performance. Green v. Railway Co., 35 C. C. A. 68, 92 Fed. 873, 877. Moreover, the August agreement was satisfactory to the Union Bank when it was made, and for many years, until it was completely performed; and the presumption is that for every burden which that bank then assumed it secured what it deemed ample concessions in return, at the time it made the contract. A fair construction of the June agreement, as we have already held, left the State Bank free from liability to the Union Bank for the money it expended or agreed to expend on account of the debts of the State Bank, so that there was no release of that liability in the August agreement, because the liability never existed. The clause which the agreement of August contained on this subject was only a more positive statement of the original intention of the parties fairly expressed in the June contract. The original contract was that the State Bank should assign "sufficient of the bills receivable, moneys, credits, and other assets to secure the Union National Bank for the payments and liabilities which it shall find it necessary to pay or assume in discharging said debts and liabilities of said State National Bank." One of the main purposes of the supplemental agreement of August evidently was to fix and determine what amount of the bills receivable was sufficient to secure the Union Bank for the payment of

97 F.—19

these liabilities. If in the later agreement it was provided.that the bills receivable should. be held by a trustee instead of by the bank, if he was to pay out of the proceeds $500 per month to the State Bank for the expenses of its liquidation, if the Union Bank was to assume a liability of $31,300, and if these burdens upon the Union Bank were additional to those specified in the original agreement, the presumption is that in the securities to the amount of $564,000, which the Union Bank obtained to secure its liability to pay $492,-838.08, it secured what it deemed a sufficient amount to protect it, not only against its liability for the debts.of the State Bank for deposits and borrowed money specified in the June contract, but also against the additional liabilities which it assumed under the terms of the August agreement. The fact that these securities have since proved inadequate is not a vice of the contract, but a fault of the bargain. The result is that there was a valuable consideration for the covenants of the Union Bank contained in the August agreement, both in the original and in the supplemental contract, and that the latter was within the powers of the bank and of its board of directors.

Nor was the relation of McNeil to these banks and to this transaction such that his vote for the August agreement as a member of the board of directors of the Union Bank can be held to vitiate that contract. It was not an agreement with him, nor was it a contract from which he could derive any personal benefit not already secured to him by the June agreement, unless, as a stockholder of the State Bank, he was relieved from indirect liability by the assumption of the indebtedness of that bank for the $31,300 on the rediscounts, or unless he derived some profit from acting as trustee, and from disbursing the $500 per month which he received, as president of the State Bank, to pay the expenses of its liquidation. There is no averment in the complaint that there was any fraud or imposition practiced upon the Union Bank. McNeil's adverse interest, if he had any, was too remote, contingent, and uncertain to warrant any court, in the absence of fraud, in abrogating or ignoring the deliberate agreement of these corporations, made many years ago, and completely performed, without objection, long before any action was brought which challenged it.

Counsel for the plaintiff in error have presented many other objections to the contract and to the transactions of these banks, but they are all disposed of by the views already expressed. The judgment below is affirmed.