FIRST STATE BANK AND TRUST COMPANY, BY ELMER A. BENSON, v. FIRST NATIONAL BANK OF ROCHESTER.[1]

February 1, 1935.

No. 30,283.

[1]Reported in 258 N. W. 593.

415

*Junell, Driscoll, Fletcher, Dorsey & Barker,* for appellant.
*Christensen & Ronken* and *Thomas E. Latimer,* for respondents.

LORING, JUSTICE.

In a suit to recover possession of pledged assets and to restrain their sale, the trial court sustained a demurrer to the answer, and the defendant has appealed from the order.

The question presented is whether a contract is valid by which a bank in failing circumstances but not alleged to be insolvent pledges its assets to secure an obligation to another bank which undertakes to pay all of its liabilities.

In December, 1930, the First State Bank and Trust Company of Rochester was financially embarrassed, although there is no allegation in the pleadings that it was insolvent. In order to escape liquidation by the commissioner of banks, and with his consent, it entered into an agreement with the First National Bank of Rochester by which it gave its note to the National Bank for $1,390,462.64, the aggregate amount of the State Bank's obligations, to secure which note it pledged all its assets. By the terms of the contract the National Bank agreed to pay all liabilities of the State Bank in full and to credit on the note the proceeds of all collateral as collected. There was immediately credited upon this note certain items which the National Bank collected in cash. The State Bank had cash on hand and in solvent banks an amount that was immediately credited. Eighty-three thousand dollars was realized from an immediate sale of the State Bank's building, furniture, and fixtures. The stockholders of the State Bank raised $203,500, which they turned over to the National Bank for credit on the note and for which they took the obligation of the State Bank, agreeing that that obligation should be subordinate to the note of the National Bank. This obligation of the State Bank to its stockholders was not, of course, assumed by the National Bank. The National Bank also credited the State Bank with the sum of $45,000 "as a bonus for the amount of your

deposits." As the other assets were collected or sold they were to be credited upon the State Bank's note to the National Bank. The State Bank authorized proceedings in its name for the collection of the collateral and also authorized the National Bank, whenever it deemed it advisable, to sell the same at such price as it might see fit. The National Bank agreed to make no charge for collection except the actual disbursements incurred. The contract also provided for the deposit of $34,000 with the National Bank to be applied on any assessments of the stockholders of the State Bank made within a year from the date of agreement. If no such assessment was made the $34,000 was to be applied in part payment of the State Bank's note to the National Bank. This note was due December 22, 1931.

It will be seen by this arrangement that the depositors and other creditors of the State Bank were immediately taken care of. November 10, 1932, the National Bank sued the State Bank for the balance then due on the note and procured a judgment for $172,330.64, upon which execution was returned unsatisfied. In August, 1933, the National Bank represented to the commissioner of banks that there should be an assessment of $100 per share against the stockholders of the State Bank in order to pay its creditors, and on October 30, 1933, the commissioner levied such an assessment. In November, 1933, the principal of the State Bank's obligation to the National Bank was reduced to $115,566.61. In January, 1934, the present commissioner of banks commenced this action, attacking the validity of the agreement between the two banks, which had been made with the knowledge and consent of his predecessor, and claiming a right to possession of the pledged assets remaining with the National Bank.

It is quite obvious that such a contract was beneficial to the depositors of the State Bank and to the credit structure and general welfare of the community in which these banks conducted their business. It was so considered by the then commissioner of banks. Unless such a contract is prohibited by law, as a matter of public policy it should stand.

The respondent contends that the contract between the two banks was in effect an agreement by which the National Bank liquidated the affairs of the State Bank and that under our decisions in Northwestern Fuel Co. v. Live Stock State Bank, 182 Minn. 276, 234 N. W. 304, and Bank of Litchfield v. McClure, 191 Minn. 308, 253 N. W. 764, the commissioner of banks is vested exclusively with the power to liquidate such banks under 2 Mason Minn. St. 1927, §§ 7682-7688. The respondent contends that the contract circumvents the statute and is void.

In Northwestern Fuel Co. v. Live Stock State Bank, 182 Minn. 276, 234 N. W. 304, the defendant had apparently transferred its assets with one exception to the Drovers State Bank of South St. Paul, which agreed to pay the deposits and bills payable of the Live Stock Bank, an agreement which evidently did not include the claim of the plaintiff Northwestern Fuel Company, which later brought an action against the Live Stock Bank and recovered a judgment upon which it made application for the appointment of a receiver for the Live Stock Bank in the district court. This court held that the district court was without power to appoint such a receiver and that 2 Mason Minn. St. 1927, §§ 7687-7689, vests the exclusive power in the commissioner of banks to take possession and liquidate the assets of an insolvent state bank, including the enforcement of the stockholders' double liability. In Bank of Litchfield v. McClure, 191 Minn. 308, 253 N. W. 764, the bank had transferred all its assets to another bank which assumed its deposits and bills payable. Subsequently two creditors obtained a judgment against the bank, and the commissioner took control and ordered an assessment against the stockholders to pay these judgments. The stockholders defended upon the ground that inasmuch as the bank had no assets there was nothing to take over and conserve—nothing in fact to liquidate. This court held that as long as debts remained to be paid and corporate life continued there was subject matter for liquidation. Obviously the first case does no more than decide that the statute precludes the appointment of a receiver by the district court. It does not decide that such a contract as we have before us is invalid. The second case de-

418

cides only that notwithstanding the bank has no assets the commissioner may proceed to collect the stockholders' liability where there are outstanding obligations of the bank.

Does 2 Mason Minn. St. 1927, §§ 7682 and 7688, require the commissioner to take charge of a bank in failing circumstances and liquidate it in the usual manner when some other bank is willing to assume all its obligations in consideration of a pledge of its assets securing a note of the failing bank for the total amount of its liabilities? We think not, especially where, as here, the bank assuming the liabilities offered complete and immediate fulfillment thereof. Doubtless it was the duty of the officers and directors of the State Bank to report its condition to the commissioner, but when, as here, a solution of the bank's financial embarrassment was offered which in its very nature the commissioner must have recognized as offering not only complete and immediate relief for all the creditors of the bank but which prevented the hardships and loss of confidence which a bank failure always inflicts upon a community, it would be a harsh, strict, if not an absurd, construction to interpret into the legislative intent a prohibition that would prevent the commissioner from giving the creditors and the community the advantage of such an arrangement. We think the commissioner under the statute had the discretionary power of permitting a contract to be effected, which with perfect safety to the creditors would prevent the immediate liquidation thereof under the statute. Both §§ 7682 and 7688, after reciting the conditions which justify action on the part of the commissioner, state that he "may forthwith take possession" of the property and business of the bank. We are of the opinion that these sections endow the commissioner with a wide discretion when an advantageous alternative is offered for the necessarily cumbersome, slow, and expensive liquidation under the statute. Section 7699-14 does not prevent the bank from hypothecating its assets to secure money borrowed in good faith from other banks to pay its obligations. In effect that was this contract. The bank substituted one creditor, which was in a position to wait for payment, for numerous creditors who may not have been. We do not

regard the transaction as an assignment for the benefit of creditors. O'Malley v. Drovers State Bank, 181 Minn. 1, 231 N. W. 407; Harris v. Briggs (C. C. A.) 264 F. 726, 731. The National Bank promised immediate and complete payment out of its own funds of the debts of the State Bank. The State Bank even received $45,000 for what amounted to good will. By inference at least a contract much less advantageous to the embarrassed bank was approved in the O'Malley case, 181 Minn. 1, 231 N. W. 407, where the court had before it an action for damages alleged to have been sustained through the transfer of its assets by the Live Stock State Bank to the Drovers State Bank of South St. Paul.

When the National Bank assumed immediate payment of the obligations of the State Bank it was the same as though it advanced the money to the State Bank to pay those obligations. Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. ed. 738. In that case the contract was similar to the one now before us and was upheld as not in violation of the national banking act, which we regard as quite like our own in its provisions in regard to liquidation. American State Bank v. Jones, 184 Minn. 498, 501, 239 N. W. 144, 78 A. L. R. 770. The federal cases appear to be unanimous in holding that such contracts on the part of the directors of a national bank in failing circumstances are authorized by the national banking act, 12 USCA, § 24(7), which gives the directors "all such incidental powers as shall be necessary to carry on the business of banking." 2 Mason Minn. St. 1927, § 7660, confers upon the board of directors of a state bank "all such powers as shall be necessary to carry on the business of banking * * * by exercising all the usual and incidental powers and privileges belonging to such business." In Wannamaker v. Edisto Nat. Bank, 62 F. (2d) 696, 700, the circuit court of appeals sustained a similar contract and held that the impending emergency endowed the directors of the bank with the power to prevent the sacrifice of the assets and to transfer them to a going concern by which they could be reduced to money under favorable conditions.

In Harris v. Briggs (C. C. A.) 264 F. 726, 731, the circuit court of appeals of the eighth circuit had before it the question of the

validity of a contract much like the one now before us. The statutes of Texas there under consideration appear to be similar to our own in the powers conferred upon the commissioner of banks and are fully as drastic in the implied prohibitions relied on by the respondent herein. The court sustained the contract. As said by the Illinois court of appeals in Candor v. Mercer County State Bank, 257 Ill. App. 192, 196:

"The protection of depositors, the welfare of other banks, and general business conditions of a community often demand such action by solvent banks, and in the absence of fraud, such transactions are not only upheld, but are encouraged."

The contract was one properly to be made by the two banks and was a valid and binding agreement under which the National Bank holds possession of the pledged assets. Hightower v. American Nat. Bank, 263 U. S. 351, 44 S. Ct. 123, 68 L. ed. 334, 338; American Nat. Bank v. Commercial Nat. Bank, 254 F. 249, 257; City Nat. Bank v. Fuller, 52 F. (2d) 870, 79 A. L. R. 71. Doubtless no such agreement would ever be made without the approval of the commissioner, but in this case it had his approval. It would have been folly for him to disapprove.

The order sustaining the demurrer to the answer is reversed.