THE FIRST NATIONAL BANK OF SKOWHEGAN, MAINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77165. Promulgated April 16, 1937.

*Franklin R. Chesley, Esq.*, for the petitioner.
*E. C. Adams, Esq.*, for the respondent.

### OPINION.

VAN FOSSAN: This proceeding involves a deficiency of $869.33 in income taxes for the calendar year 1931. The question presented is whether the taxpayer is entitled to a $10,000 deduction, being the amount paid by petitioner to a second bank in consideration of such bank assuming the liabilities of a certain trust company, for the alleged purpose of protecting petitioner against losses that would have resulted if the trust company had been involuntarily closed.

Throughout the calendar year 1931 petitioner conducted a banking business in Skowhegan, Maine. During the early part of 1931 the Skowhegan Trust Co. and the Skowhegan Savings Bank were

also engaged in the banking business in Skowhegan. The three banks had approximately 14,000 depositors and combined assets aggregating approximately $10,000,000.

At March 31, 1931, the national bank examiner determined that the securities owned by petitioner had a value $51,962 below their book value, and later, on August 31, 1931, he determined that petitioner's securities were $87,521 below their book value.

On or about May 1, 1931, the Skowhegan Trust Co. was in serious financial difficulty, a situation that was brought to the attention of petitioner's officers by the state banking commissioner. The Trust Co.'s capital stock was $50,000 and it needed $73,500 of new funds to make it solvent. At or about that time the officers of the Trust Co. approached petitioner to see if a merger could be effected, but petitioner rejected the proposal.

Shortly thereafter the banking commissioner approached the petitioner and the Skowhegan Savings Bank a second time, urging the importance of immediate action and advising that unless the added capital was available within two or three days the Trust Co. would be closed.

On May 1, 1931, the Augusta Trust Co. of Augusta, Maine, was operating nine branches. It agreed to take over the assets of the Skowhegan Trust Co., subject to liabilities, other than to stockholders, provided it received $73,500 under a certain agreement dated May 2, 1931, the terms of which are hereinafter set forth.

With this information petitioner's board of directors, at a special meeting on May 2, 1931, obligated the bank to pay $10,000 to the Augusta Trust Co. The resolution stated that the petitioner, certain named individuals, and the Skowhegan Savings Bank "severally covenant and agree" to pay Augusta Trust Co. the amounts set opposite their names in consideration for the latter assuming all the liabilities of the Skowhegan Trust Co., except its liabilities on capital stock or to stockholders as such.

As of the same date, May 2, 1931, petitioner and the Skowhegan Savings Bank each obligated itself for $10,000, and the named individuals obligated themselves to pay the sums set opposite their names, provided the Augusta Trust Co. assumed the liabilities as aforesaid. The opening paragraph of the agreement states that "Whereas it would be detrimental to the best interests" of the petitioner "and would depreciate the value of its assets and the securities of its loans for the Skowhegan Trust Company, * * * to go into voluntary liquidation, and whereas such action was eminent [sic] and threatened", that if Augusta Trust Co., on or before May 5, 1931, assumes all the liabilities of Skowhegan Trust Co., except as noted, that the parties thereto would severally pay Augusta Trust a total of $73,500.

Among the parties obligating themselves to pay specified sums to the Augusta Trust Co. under the above agreement were four stockholders of the petitioner, three individuals, and the Skowhegan Savings Bank. The three individuals obligated themselves to pay $35,000.

On May 7, 1931, petitioner paid the Augusta Trust Co. $10,000 by draft drawn on the National Shawmut Bank of Boston. This payment was charged on petitioner's books to its profit and loss account.

The Augusta Trust Co. acquired the assets and assumed the liabilities of the Skowhegan Trust Co. on June 15, 1931, and thereafter it operated the same as a branch.

During the taxable year petitioner's outstanding capital stock amounted to $150,000. Its surplus and undivided profits account at May 7, 1931, amounted to $501,935.97. It paid semiannual dividends on its stock of 5 percent each on May 1 and November 1, 1931.

Petitioner had no financial interest in the Skowhegan Trust Co. at any time during 1931. No agreement was made respecting the repayment of the $10,000 paid to the Augusta Trust Co., and the repayment thereof was not expected.

On its income tax return for the calendar year 1931 petitioner treated this $10,000 payment as a deduction from its gross income, reporting a net income for the year of $244.40. The respondent disallowed the deduction for the reason "that a contribution to competitive business in order to save it from bankruptcy and thereby avoid a run on taxpayer's business does not constitute an ordinary and necessary expense of doing business,   *   *   *."

In his brief respondent contends that the law applicable to national banks, Revised Statutes 5136, and the Revenue Act of 1928, must be construed together; that, when so construed, the evidence must show that in paying the $10,000 petitioner lawfully exercised an incidental power granted to it under the National Banking Act; that the exercise of such incidental power was imperative and necessary to the conduct of its banking business; that the power was exercised by its board of directors or duly authorized agents subject to law; and that the $10,000 expenditure was an ordinary and necessary expense within the purview of the 1928 Act, paid by petitioner in 1931.

Stated differently, respondent's first contention · regarding this issue is that petitioner exceeded its corporate powers in entering into the contract and in making the disbursement. If respondent is correct in this contention the contract was *ultra vires*, and petitioner's acts were void under the Federal rule, *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24; *McCormick* v. *Market Bank*, 165 U. S. 538; *California Bank* v. *Kennedy*, 167 U. S. 362, it being too

well settled to admit of any doubt that the Federal statutes relative to national banks constitute the measure of their authority. A national bank can not rightfully exercise any powers except those expressly granted, or which are incidental to carrying on its business of banking. *California Bank* v. *Kennedy, supra; First National Bank* v. *Missouri*, 263 U. S. 640; *Texas & Pacific Railway v. Pottorff*, 291 U. S. 245.

Section 5136 of the Revised Statutes, 12 U. S. C. A. 24,[1] sets forth the corporate powers of national banking organizations. The contract which petitioner entered into on May 2, 1931, does not, in our opinion, fall under any of the so-called "express" powers referred to in section 5136. While the statute grants the right to make contracts, this grant necessarily relates to contracts within the scope of its business. *Dresser* v. *Traders National Bank*, 165 Mass. 120; 42 N. E. 567. If, therefore, the contract and payment pursuant thereto is *intra vires*, it must be based upon and arise out of the exercise of an *incidental power*, *First National Bank* v. *Converse*, 200 U. S. 425; *California Bank* v. *Kennedy, supra; Logan County Bank* v. *Townsend*, 139 U. S. 67.

Can it be said that the payment here involved was made in the exercise of an incidental power of the petitioner? The question is clear-cut. The right of the bank to make the payment was duly considered, passed upon, and authorized by petitioner's board of directors. The directors were faced with a situation which was, in their opinion, desperate. In their judgment irreparable loss faced the bank, its stockholders, and its depositors unless quick and positive action was taken. Securities owned by the bank were $51,000 below their book value and declining. The closing of one bank in the community by the state banking authorities might shatter public confidence and cause a run on the community's two remaining banks. The imminence of heavy cash withdrawals by frightened and panic-stricken depositors would necessitate large amounts of cash on hand. Assets would have to be sacrificed, and the bank would inevitably suffer losses therefrom. We are of the opinion that judicial notice can be taken of the fact that banks, thoroughly sound financially, can not withstand the continuous and insistent

---

[1] § 24. *Corporate powers of associations.* Upon duly making and filing articles of association and an organization certificate a national banking association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power—

\* \* \* \* \* \*

Third. To make contracts.

\* \* \* \* \* \*

Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter.

withdrawals of cash by their depositors without sustaining a loss, and that this is particularly true in periods of depression when public confidence is at its lowest ebb. In the opinion of the directors, unless action was taken petitioner faced the alternative of possible ruin or, at the least, losses in excess of the $10,000 expenditure here involved.

We have carefully, but unsuccessfully, searched the decided cases for situations four-square to the facts herein. Respondent suggests that the instant case presents a situation closely akin to that in which one bank undertakes to guarantee the payment of debts of another.

The general rule undoubtedly is that a national bank may not lend its credit to another by becoming surety, endorser, or guarantor. *Howard & Foster Co.* v. *Citizens' National Bank* (S. C.), 130 S. E. 758; *Dewey Column & Monumental Works* v. *Ryan* (Iowa), 221 N. W. 800; *Farmers & Miners Bank* v. *Bluefield National Bank*, 11 Fed. (2d) 83; certiorari denied, 271 U. S. 669; *Nakdimen* v. *First National Bank* (Ark.), 6 S. W. (2d) 505; certiorari denied, 278 U. S. 635; *O'Connor* v. *Bankers Trust Co.*, 289 N. Y. S. 252; *Gardiner Trust Co.* v. *Augusta Trust Co.* (Me.), 182 Atl. 685; 7 C. J. 595.

It does not follow, however, that a bank can not, under any circumstances, enter into a contract of guaranty. On the contrary, it may so contract if the guaranty is for its own benefit and is incidental to the banking business. *Southern Exchange Bank* v. *First National Bank of Dublin*, 37 Ga. App. 645; 141 S. E. 323; *Ellis* v. *Citizens' National Bank*, 25 N. M. 319; 183 Pac. 34; 6 Fletcher, Cyclopedia Corporations, ¶2592; *Norton Grocery Co.* v. *People's National Bank*, 144 S. E. 501; *People's Bank* v. *National Bank*, 101 U. S. 181.

Furthermore, a national bank can validly contract to take over the assets and assume the liabilities of another bank in the exercise of its ordinary powers as a banking corporation. *Schofield* v. *State National Bank*, 97 Fed. 282; *Wyman* v. *Wallace*, 201 U. S. 230; *City National Bank of Huron* v. *Fuller*, 52 Fed. (2d) 870; *Wannamaker* v. *Edisto National Bank of Orangeburg*, 62 Fed. (2d) 696.

The petitioner here did not take over the assets or assume the liabilities of another bank, nor did it guarantee the debts of Skowhegan Trust. It agreed to and did furnish $10,000 of the additional capital demanded of Skowhegan Trust by the state banking authorities. Part of the consideration received by petitioner for this expenditure was the agreement by Augusta Trust that it would take over the assets and assume the liabilities of Skowhegan Trust. Under the doctrine of *Wyman* v. *Wallace, supra*, petitioner itself, could have taken over these assets and assumed the liabilities; but the directors rejected this suggestion. It was, however, their opinion that the assumption of the burden by Augusta Trust was worth $10,000 to petitioner.

The directors realized the embarrassing and possibly disastrous consequences which would flow from a failure of the Skowhegan Trust Co. to open its doors. As a matter of self-preservation of their own institution, this contract offered the most satisfactory solution of a serious problem. In any event petitioner stood to lose as a result of banking conditions in Skowhegan. The directors selected the avenue of escape which appeared to offer the minimum loss. It is difficult to see from this record how any other alternative could have better safeguarded petitioner's own depositors and stockholders. We are satisfied that where circumstances force a bank to act for its own self-protection, the power to so act will be found in the incidental powers necessary to carry on the business of banking.

Prior to the banking crisis of 1933 many of the stronger banks of the country were forced to aid weaker members in order to protect their own interests. In *O'Connor* v. *Bankers Trust Co.*, *supra*, decided June 29, 1936, suit was brought on an alleged agreement by member banks of the New York Clearing House Association whereby they agreed to protect the depositors of another member bank, Harriman National Bank & Trust Co., if the Comptroller would refrain from closing the Harriman Bank. In determining the issue presented the court used language equally applicable to the situation here involved:

> The right of self-preservation applies to banks as well as to business corporations and individuals generally. When a crisis arises in which to protect its own depositors and stockholders against loss, a guaranty by one bank of the deposits of another is essential, the law does not withhold that power. It is not necessary that the bank be faced with actual ruin; it is sufficient that danger, real and immediate, of substantial loss to its depositors is present, and that the risk assumed is not out of proportion to the damage threatened, and not out of harmony with the capital structure and the financial condition of the banks involved. In this, as in so many other legal situations, the rule of reason applies. Where those charged with the management of a bank act in good faith and deliberately, with an eye to its own interests and welfare, the exercise of the power here invoked will be upheld.

> \*       \*       \*       \*       \*       \*       \*

> Around July, 1932, business was at its lowest ebb. The banking structure was highly sensitive to the marked depression which existed. The Harriman Bank was relatively a small bank to be sure, but the slightest spark may result in a widespread conflagration difficult to control. No bank is immune when confidence is generally disturbed, and particularly when lack of confidence assumes the form of a heedless "run" on another member bank. The danger of heavy withdrawals of deposits forces a bank to provide itself with large amounts of cash; assets must be sacrificed at the very time when prices are lowest. The failure of a single bank may have repercussions which make themselves felt throughout the financial structure. Statistics, however respectable, may often be deceptive. Subsequent events demonstrated that there was some rational basis at least for the fears that were entertained concerning the effect of a failure of the Harriman Bank on the depositors and stockholders of other clearing house banks. If, in such a situation action to prevent

the failure of a member bank is taken by other member banks in the exercise of fair and honest judgment at the time, for the purpose of preserving the security and integrity of their own institutions, such action, within reasonable limitations, is not an invalid exercise of corporate power.

It is difficult for the human mind to carry itself back in point of time uninfluenced by subsequent events. With the danger past and memory short the defendants now plead that they lacked the power to do what banks throughout the country have often found it necessary to do. They plead that the law has denied them the power to conserve their own imperiled interests. The practice of the clearing house banks in this city to participate in "rescue parties" was clearly established by the evidence. The form such action assumed at various times was different from that taken in this case, but the ultimate object was the same.

See also the decisions in *Norton Grocery Co.* v. *People's National Bank, supra; Wyman* v. *Wallace, supra; Morris* v. *Third National Bank of Springfield*, 142 Fed. 25, and cases there cited.

Unquestionably, the action of petitioner and the other parties to the agreement of May 2, 1931, was beneficial to the then depositors of the Skowhegan Trust Co. and to the credit structure and general welfare of the community. We can not say from the record that the state banking authorities actually approved the contract, but it is a fact that the contract was carried out. This would justify an inference that the state authorities approved the contract, particularly in view of their insistence that steps be taken which would make it unnecessary for the state to close the Skowhegan Trust Co. Where this situation exists it would seem that, unless the contract is prohibited by law, it should stand. *First State Bank & Trust Co. of Rochester* v. *First National Bank*, 258 N. W. 593; cf. *Hamburg Bank* v. *Ouachita National Bank in Monroe*, 78 Fed. (2d) 100.

Respondent insists that the contract is prohibited by law and is invalid. He relies upon *Board of Commissioners* v. *Citizens' Trust & Savings Bank*, 123 N. E. 130 (Indiana, 1919). He contends that the reasons advanced in that case for the banks' actions are identical with the reasons advanced by this petitioner. In that case two state and two national banks agreed to assume certain stated percentages of the liabilities of a fifth insolvent bank. All the banks were in the same community and the action was taken in order to prevent the insolvent bank from closing. The agreement made one of the state banks liquidating agent of the insolvent bank. The board of commissioners sued the Citizens' Trust, as liquidating agent, for the amount of their deposit in the insolvent bank. One of the defenses raised was that the banks' agreement was *ultra vires*. The court held that the state auditor had disregarded the state statutes regarding insolvent banks; that the liquidating agent's action in taking possession of property of the insolvent was without warrant of law; that appellee banks had voluntarily assumed to supply whatever sums were necessary to pay the deficiency of the insolvent;

that appellee banks might thereby be required to use all their surplus funds, or might themselves become insolvent; that the appellee banks were agreeing to spend money, not their own, but belonging to the stockholders and depositors; that there was no legally sufficient consideration for the promise of Citizens' Trust to pay the indebtedness of the insolvent bank to the board of commissioners.

We have been unable to find any other court following this decision of the Indiana Appellate Court. There is a very recent decision by the Supreme Court of Maine (March 6, 1936) regarding state banks, which seems to be in accord with the principle of the Indiana decision, *Gardiner Trust Co.* v. *Augusta Trust Co.*, 182 Atl. 685, hereinbefore cited. We think, however, that both of these decisions are distinguishable from the instant case. The court, in the Maine case, held that a bank has no implied power to become a guarantor *except to protect an investment of its own,* or as an incident to the transfer of commercial paper, or to effectuate a merger with another institution, and any contract by which it seeks to do so is void. The very purpose of the agreement in this proceeding was to protect assets and investments of the petitioner bank, all of which were seriously threatened.

In the Indiana decision the court found that the state statutes had been ignored and disregarded. It found that the banks had bound themselves to pay an *undetermined liability*, in the paying of which they might themselves become insolvent. It found further that there was no consideration for the agreement. In the present proceeding the state authorities proceeded in accordance with the statutory powers lodged in the state banking authorities. It is a matter of record that petitioner and others were urged to act quickly in order to prevent the closing of the bank under the mandate of the statute. Section 94, chapter 57, Maine's Revised Statutes, 1930, grants the banking commissioner broad powers of discretion in regard to trust companies, but if the directors fail to act to protect the trust company's creditors, the commissioner is required by statute to act. Here the petitioner bound itself to pay only a specified sum. There could be no further call upon it for additional funds. Under the agreement an out of town bank assumed *all liabilities* of Skowhegan Trust in consideration of petitioner's payment, the payment of $63,500 by other signatories to the agreement, and the transfer of the assets of Skowhegan Trust. This was, in our opinion, a valid consideration for the contract, which further distinguishes the instant proceeding from *Board of Commissioners* v. *Citizens' Trust & Savings Bank*. Moreover, it should be remembered that here the contract has been fully executed, and all parties have derived every possible benefit, while in the *Citizens' Trust* case the contract was executory. *Hamburg Bank* v. *Ouachita National Bank in Monroe, supra.*

Our research convinces us that no hard and fast rule can be laid down as to when a contract is beyond the incidental powers of a national bank. Each proceeding must, in the last analysis, be bottomed upon its own facts. The legal principles can be ascertained from the statutes and the decided cases; their application is the province of the court. In the present situation we may well paraphrase the language of the Supreme Court in *Wyman* v. *Wallace*, 201 U. S. 230, 231, and say that the directors of petitioner knew that "a neglect to pay would precipitate a run" with its irreparable consequences. A contract which would prevent these results, and completely dispose of the emergency, was within the incidental powers of a national bank, *Wannamaker* v. *Edisto National Bank of Orangeburg*, 62 Fed. (2d) 696, 700, particularly in view of the fact that petitioner's expenditure in no way impaired its capital structure, or interfered with the payment of dividends during the taxable year on its capital stock.

Having determined that the contract was *intra vires*, we must next determine whether it is a statutory deduction under section 23 (a) or (f), Revenue Act of 1928.[2] Petitioner urges that it is deductible in any one of three ways, namely, as an ordinary and necessary expense, as a loss, or as a donation from which it received a direct benefit. Both parties cite and rely upon *Welch* v. *Commissioner*, 290 U. S. 111.

In the *Welch* case the taxpayer paid portions of the claims of former customers of a bankrupt corporation, of which he had been secretary, in order to reestablish his relations with them and to solidify his individual credit and standing. The question was whether such payments were allowable deductions. The Court held the payments were not deductible and that they were extraordinary, instead of ordinary, expenses. The Court, however, specifically recognized that there are many phases of this problem; that it is impossible to harmonize all the cases involving deductions for ordinary and necessary business expenses; and that there are many cases whose facts require border line decisions. We are satisfied that this proceeding presents a different phase from, and is·not controlled by, *Welch* v. *Helvering*.

This Board and the courts have repeatedly allowed deductions where the disbursement was made to protect or promote the tax-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) *Expenses.*—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.

 *  *  *  *  *  *  *

(f) *Losses by corporations.*—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

payer's business. *Harold Mortenson*, 3 B. T. A. 300; *Alfred Le Blanc*, 7 B. T. A. 256; *Seufert Brothers Co. v. Lucas*, 44 Fed. (2d) 528, reversing 14 B. T. A. 1023; *A. King Aitkin*, 12 B. T. A. 692; *Louisiana Jockey Club, Inc.*, 13 B. T. A. 752; *Edward A. Pierce*, 18 B. T. A. 447; *Helvering* v. *Community Bond & Mortgage Corporation*, 74 Fed. (2d) 727, affirming 27 B. T. A. 480, cases where disbursements made to protect taxpayer's business were held deductible as ordinary and necessary expenses; *G. T. Wofford*, 15 B. T. A. 1225; petition to review denied, 49 Fed. (2d) 1027; *E. L. Potter*, 20 B. T. A. 252; *H. M. Howard*, 22 B. T. A. 375; *Commissioner* v. *Chicago Dock & Canal Co.*, 84 Fed. (2d) 288; *Kornhauser* v. *United States*, 276 U. S. 145, cases involving attorney fees and/or compromise of litigation held deductible as ordinary and necessary expenses; *Poinsett Mills*, 1 B. T. A. 6; *Anniston City Land Co.*, 2 B. T. A. 526; *Killian Co.*, 20 B. T. A. 80; *Yamhill Electric Co.*, 20 B. T. A. 1232; *Fairmont Creamery Corporation* v. *Commissioner*, 89 Fed. (2d) 810, cases involving donations that were held deductible as ordinary and necessary expenses. In each of the foregoing cases there was a direct connection between the expenditure made and the business operated.

In the following cases the courts have refused to allow the deduction claimed as an ordinary and necessary expense: Voluntary assumption of debts of predecessors, *Wallingford Grain Corporation* v. *Commissioner*, 74 Fed. (2d) 453, and cases there cited; payment of $35,000 to secure a $5,000,000 loan, *Bing* v. *Helvering*, 76 Fed. (2d) 941; expenses incident to a merger, *Motion Picture Capital Corporation* v. *Commissioner*, 80 Fed. (2d) 872; expenditures to avert passage of legislation harmful to taxpayer's business, *Sunset Scavenger Co.* v. *Commissioner*, 84 Fed. (2d) 453; benefits from donations to community chest too remote to be deductible, *Helvering* v. *Evening Star Newspaper Co.*, 78 Fed. (2d) 604.

Considering the facts and circumstances under which this expenditure was made, we are of the opinion that the expense grew directly out of and proximately resulted from petitioner's banking business. *H. M. Howard, supra.* We have observed that it has been recognized that banks and banking organizations participated in "rescue parties" for weaker banks prior to the banking holiday. *O'Connor* v. *Bankers Trust Co., supra.* It is a matter of common knowledge that private business was unable to cope with the depression and that governmental agencies were created to render financial assistance and protect banks, railroads, insurance companies, and individuals. This petitioner, using its own resources, sought only to protect itself with the least possible cost to its stockholders and depositors. It acquired no capital asset by the disbursement. In the opinion of its directors,

this $10,000 expenditure avoided an imminent and threatening loss of a larger amount. We feel that the payment under these circumstances was an ordinary and necessary expense properly chargeable against 1931 gross income, and we so hold.

Reviewed by the Board.

*Decision will be entered for the petitioner.*