CLEVELAND SAVINGS SOCIETY, DISSOLUTION, IN RE.

Common Pleas Court, Cuyahoga County.

No. 719002.   Decided December 21, 1961.

292

WASSERMAN, J. This is a case of first impression in the State of Ohio. The Petitioner, Cleveland Savings Society (formerly known as Society for Savings in the City of Cleveland), a mutual savings bank, filed a petition in this Court for judicial supervision of proceedings in dissolution pursuant to the provisions of Section 1702.50, Revised Code.

Subsequent to the filing by Cleveland Savings Society of said petition three additional actions, all of which involved the same subject matter, were commenced. Because these cases, entitled *Beatrice H. Harmon et al v. Society for Savings Company et al.* (Case No. 719,114); *Richard B. Kay, ex rel. State,* v. *Cleveland Savings Society et al.* (Case No. 721,393); and *William L. Blake v. Society for Savings in the City of Cleveland et al.* (Case No. 721,404), involved substantially the same issues they were consolidated for hearing.

The transaction which constitutes the subject matter of all of said actions is described as follows:

On December 26, 1958, prior to the dissolution referred to above, Society for Savings in the City of Cleveland (hereinafter referred to as "Society"), entered into a written agreement with Society National Bank of Cleveland (hereinafter referred to as "National"), which provided, in part, for—

(a) the cessation of business by Society at the close of business December 31, 1958;

(b) the sale and transfer by Society of all of its assets to National in consideration of the assumption by National of all of Society's liabilities;

(c) the issuance by National of all of its authorized capital stock, except Directors' qualifying shares, amounting to 119,800 shares, to Society for Savings Company in the City of Cleveland (hereinafter referred to as "Company");

(d) the issuance by Company of 287,581 common shares (all of its issued and outstanding shares) and the deposit thereof in the Voting Trust;

(e) the issuance by the Voting Trustees and delivery to Society of Voting Trust Certificates evidencing such deposit and the beneficial ownership of such 287,581 shares of Company by Society; and

(f) the adoption by Society of a resolution to dissolve and a Plan for the Distribution of such Voting Trust Certificates for shares of Company (which then constituted Society's sole remaining assets) to its regular savings depositors as of the close of business December 31, 1958.

In fulfillment of such Agreement, Society ceased business at the close of banking hours December 31, 1958. Thereupon the transfer of assets, assumption of liabilities, issuance and deposit of stock and Voting Trust Certificates provided for by the Agreement was carried out. Immediately thereafter, the Certificate of Dissolution, bearing the necessary approval of the Superintendent of Banks of Ohio, upon which this proceeding is based, was filed with the Secretary of State of Ohio.

Before considering the various aspects of this transaction, it is necessary to digress briefly into the history of Society in order to properly present the factual picture in this case. Society was originally incorporated by special act of the Ohio Legislature on March 22, 1849, and was reincorporated pursuant to the provisions of Section 710-148k, General Code, on December 18, 1933. From December 18, 1933, to December 31, 1958, Society operated pursuant to the provisions of Sections 710-148a et seq, General Code, as amended, which under the Ohio Revised Code became Chapter 1109. In 1958, Society was one of three mutual savings banks in the entire State of Ohio.

In order to expedite the proceedings and to maintain an orderly procedure, this Court proposed to the Petitioner and the various Objectors, who had filed in the case or whose cases had been consolidated for hearing with this case, seven issues which the Court felt had to be resolved in order to reach a decision. The Petitioner and the Objectors were requested to file a statement of position on each issue, present evidence and testimony, and file briefs. The Court has reviewed these issues in the order presented which is not necessarily in the order of importance.

The first issue is titled:

"Was the sale of the assets of the Society for Savings in the City of Cleveland to the Society National Bank of Cleveland undertaken and carried out in accordance with law?" In order to arrive at an answer to this question, it is essential to determine first of all whether Society had the authority to transfer its assets and liabilities for the consideration set forth in the agreement and, secondly, whether National had the authority to purchase such assets and assume such liabilities. This Court is of the opinion. that both Society and National had such authority.

In order to determine the authority of Society, it is necessary to refer to Chapter 1109, Revised Code. It is apparent from reading the sections under this chapter that they are not the only sections of the Ohio Revised Code applicable to Society. For example, Section 1109.03, Revised Code, states:

"Upon receipt of a copy of the articles of incorporation of a proposed society for savings or savings society, the superintendent of banks shall make an examination in the manner provided by Section 1103.06, Revised Code, in respect to the incorporation of a bank, with 'stockholders,' as used in such section, being construed as 'members' for the purposes of this section. Section 1103.07, Revised Code, shall apply to such society. When such articles are recorded by the secretary of state, the incorporators and any other members designated in the articles, and their successors, shall, from the date of such recording, constitute a body corporate with perpetual succession, with the powers provided in Section 1702.12, Revised Code. So far as consistent with Sections 1109.02 to 1109.15, inclusive, Revised Code, Sections 1702.01 to 1702.58, inclusive, Revised Code, shall apply to societies incorporated under Sections 1109.02 to 1109.15, inclusive, Revised Code."

Section 1109.14, Revised Code, states:

"Societies incorporated under Sections 1109.02 to 1109.15, inclusive, Revised Code, are subject to all sections of the Revised Code relating to examinations of banks, payment of fees to the superintendent of banks, keeping books and accounts, establishing branches, making reports to the superintendent, furnishing by officers of bonds for the faithful performance of

their duties as such officers, compliance with orders of the superintendent, consolidation with or transfer of assets to another society for savings or to a bank, or going into liquidation, in which matters the voting rights shall be exercised by the members of the society; to all sections of the Revised Code relating to powers of the superintendent to take possession and make disposition of the business and property of any bank, appointment of a conservator for a bank, resumption of business by a bank, liquidation of banks, purchase of real estate by banks, receipt and payment of deposits by savings banks, power of the board of directors of a savings bank to prescribe rules and regulations relating to deposits, providing and letting out safety deposit boxes, receiving property for safe keeping, deposits in names of minors, joint deposits, maintenance and depositing of reserves required of savings banks, payment of deposits in trust for another, and dealing in foreign exchange; and to Section 1115.19, Revised Code; and the trustees of such societies shall cause minutes of meetings to be kept and recorded as directors of a bank are required to do by Section 1103.27, Revised Code.''

The former Section 1109.03, Revised Code, makes applicable Sections 1702.01 to 1702.58, inclusive, Revised Code, so far as they are consistent with Sections 1109.02 to 1109.15, inclusive, Revised Code. The latter section, Section 1109.14, Revised Code, makes applicable all sections of the Ohio Revised Code relating to consolidation with or transfer of assets to another society for savings or to a bank.

Section 1702.39(A), Revised Code, which is not inconsistent with Sections 1109.02 to 1109.15, inclusive, Revised Code, states:

''(A) Unless the articles or the regulations, or the terms of any trust on which the corporation holds any particular property, otherwise provide, a lease, sale, exchange, transfer, or other disposition of any assets of a corporation may be made without the necessity of procuring authorization from the court under Section 1715.39, Revised Code, upon such terms and for such consideration, which may consist, in whole or in part, of money or other property, including shares or other securities or promissory obligations of any corporation for profit, domestic

or foreign, as may be authorized by the trustees; provided that a lease, sale, exchange, transfer, or other disposition of all, or substantially all, the assets may be made only when such transaction is also authorized (either before or after authorization by the trustees) by the voting members at a meeting held for such purpose, by the affirmative vote of a majority of the voting members present if a quorum is present, or, if the articles or the regulations provide or permit, by the affirmative vote of a greater or lesser proportion or number of the voting members, and by such affirmative vote of the voting members of any particular class as is required by the articles or the regulations. Notice of the meeting of the members shall be given to all members whether or not entitled to vote thereat. Such notice shall be accompanied by a copy or summary of the terms of such transaction.''

Section 1103.37(B), Revised Code, which relates to banks generally, states in part:

''(B) Without the approval of any authority of this state and in the manner provided by the laws of the United States, a national banking association located in this state and a bank organized under the laws of this state may consolidate with each other, and the resulting corporation may be either a national banking association or a bank organized under the laws of this state, or either of such banks may transfer its assets and liabilities to the other bank; provided, that in either case, the vote of the holders of each class of voting stock of the bank organized under the laws of this state shall be required to the same extent as provided in division (C) of this section.''

It is clear from reading these last two sections of the Ohio Revised Code that Society had the authority to transfer its assets and liabilities to National, a national banking association, for the consideration set forth in the agreement.

In order to determine the authority of National, it is necessary to refer to the National Banking Act, 13 Stat. 100 (1864), 12 U. S. C. section 21 et seq. (1958), hereinafter referred to as ''NBA,'' since National was incorporated as a national banking association on December 27, 1955, pursuant to the provisions of the NBA.

Under section 24 of the NBA, a national banking associa-

tion shall have power "to make contracts" and "to exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking." It has been held that pursuant to such powers, a national bank has the authority to purchase the assets and assume the liabilities of another bank. See *Schofield* v. *State National Bank of Denver, Colorado*, 97 Fed., 282 (8th Cir., 1899). In that case, two banks, both organized and doing business under the national banking law, entered into a contract by which the Union National Bank of Denver, Colorado, agreed to assume and pay the liabilities of the State National Bank of the same city, in consideration of which the latter transferred to the former its office furniture and cash assets, and assigned to a trustee for collection a certain amount of its bills receivable, selected by the Union Bank; the proceeds to be paid to Union Bank until it reimbursed the amount it should be required to pay out. In reference to the agreement the Court stated:

"This agreement required the Union Bank to do nothing which national banks are not authorized to do,—nothing which they do not do in the conduct of the ordinary business of banking. That bank was empowered 'to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking. . .' Rev. St. Sec. 5136." *Schofield* v. *State National Bank, supra*, at 287.

This principle of law is succinctly stated in paragraph 3 of the headnotes of the case as follows:

"A contract by a national bank to assume and pay the liabilities of another bank in consideration of the transfer to it by the other bank of its office furniture and lease and its cash and cash assets, and the further assignment to a trustee for its benefit of bills receivable and securities, is not *ultra vires*, but is within its powers conferred by statute to conduct a general banking business."

Other cases which hold that a national bank has the power to purchase the assets and assume the liabilities of another bank are: *City National Bank of Huron, S. D., et al, v. Fuller*, 52 F. (2d), 870 (8th Cir., 1931), wherein the Court stated at page 872:

"As far as the First National was concerned, there can be no question that it had the right, in carrying on a general banking business, to take over the assets and assume the liabilities of the City National. It was within the general power of a national bank granted by Section 24 (7), Title 12, U. S. C. A., 'to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking.'"

And *Houston* v. *Drake*, 18 F. Supp., 693 (D. C. Ariz., 1937), reversed on other grounds, *Houston* v. *Drake*, 97 F. (2d), 863 (9th Cir., 1938), wherein it is stated at page 696:

"A purchase by a national bank of all of the assets of another bank, state or national, on the assumption of the debts and obligations of the latter is upheld in decisions of federal courts as within the incidental powers of national banking associations under the provisions of Rev. St. Section 5136 as amended, Title 12 U. S. C. A. Section 24, subd. 7."

See also *Nakdimen* v. *First National Bank,* 177 Ark., 303, 6 S. W. (2d), 505 (1923), *cert. denied,* 278 U. S., 635 (1928).

It is clear from these cases that National had the authority to purchase the assets and assume the liabilities of Society. In order to complete the transaction, however, it was necessary to have the written consent and approval of the Comptroller of the Currency. Title 12, U. S. C., Section 1828(c) (1958), reads in part as follows:

"* * * No insured bank shall (i) merge or consolidate with an insured State bank under the charter of a State bank or (ii) assume liability to pay any deposits made in another insured bank, if the capital stock or surplus of the resulting or assuming bank will be less than the aggregate capital stock or aggregate surplus, respectively, of all the merging or consolidating banks or of all the parties to the assumption of liabilities, at the time of the shareholders' meetings which authorized the merger or consolidation or at the time of the assumption of liabilities, unless the Comptroller of the Currency shall give prior written consent if the assuming bank is to be a national bank or the assuming or resulting bank is to be a District bank; * * *."

The evidence establishes that pursuant to the provisions of Section 1828(c), National filed an Application for Consent to

Purchase Assets and Assume Liabilities on Form No. 1932 of the Treasury Department with the Comptroller of the Currency, and that his consent to the transaction was granted.

One of the Objectors has asserted that "the plan of Society, although in form, a transfer of assets, is, in substance, a 'merger' and is, therefore illegal as being designed to avoid the provisions of U. S. C. Title 12, Section 34 a, b, and c." From the evidence presented, this Court can find no basis for this assertion. The courts have held that a transfer of assets and liabilities of a bank to a national bank does not constitute a statutory consolidation or merger unless the provisions of the federal statutes relating to consolidation and merger are followed. See *Adams, Receiver, v. Nagle*, 303 U. S., 532 (1938); *City National Bank of Huron, S. D., v. Fuller*, 52 F. (2d), 870 (8th Cir., 1931); *Drovers' & Mechanics' National Bank of Baltimore, Md., v. First National Bank of Sutton, W. Va., et al.*, 260 Fed., 9 (4th Cir., 1919); and, *Pankey v. Hot Springs National Bank*, 46 N. M., 10, 119 P. (2d), 636 (1941). No such steps as required by the federal statutes were taken with respect to this transaction. On the contrary the transaction was described and spelled out to the Comptroller of the Currency, the Superintendent of Banks of the State of Ohio, and the Internal Revenue Service as a transfer of Society's assets and liabilities to National, in consideration of the assumption by National of all the liabilities of Society and the further considerations set forth in the agreement, and was acknowledged by these governmental authorities as such.

The authority of both Society and National to enter into this transaction having been established, it is essential, in order to complete the first issue, to determine whether each bank took the required action in accordance with law to complete the transaction.

In order to answer this question, it is important at this point to digress again into the history of Society. At the time of its reincorporation in 1933, Society, pursuant to Section 710-148k, General Code, filed with the Secretary of State a Certificate of Reincorporation setting forth such matters as would be required in the original articles of incorporation of a society for savings. This Certificate included the names of the Trustees and the Members of the corporation together with a pro-

vision for the election of additional Members. The evidence indicates that there was no other class of Members, either voting or non-voting.

Section 1109.14, Revised Code, provides in part as follows:

"Societies incorporated under Sections 1109.02 to 1109.15, inclusive, Revised Code, are subject to all Sections of the Revised Code relating to examinations of banks, payment of fees to the superintendent of banks, keeping books and accounts, establishing branches, making reports to the superintendent, furnishing by officers of bonds for the faithful performance of their duties as such officers, compliance with orders of the superintendent, consolidation with or transfer of assets to another society for savings or to a bank, or going into liquidation, in which matters the voting rights shall be exercised by the members of the society; * * *."

This section provides that with respect to a transfer of assets to another society for savings or to a bank, or going into liquidation, the voting rights shall be exercised by the members of the society. Neither this section nor Section 1103.37, Revised Code, require any prior notice to, consent by, or vote of depositors. There is nothing in the evidence or in the law to indicate that depositors of Society were ever regarded as Members or had ever exercised any voting power.

The evidence discloses that after proper notice in accordance with law, meetings of the Trustees and the Members of Society were held on December 26, 1958, at which meetings the transfer of assets, dissolution and adoption of the Plan of Distribution were authorized and voted upon by the respective bodies. The Trustees, 15 of the 17 being present, voted unanimously in favor of the resolutions authorizing the transfer of assets, dissolution and Plan of Distribution. All of the Members, 15 being present in person and 2 by proxy, voted unanimously in favor of the transfer.

With respect to National, after proper notice in accordance with law, special meetings of the Directors and stockholders of National were held on December 26, 1958, at which meetings an increase in shares of National and the transaction between the two banks were authorized and voted upon by the respective groups. The shareholders, representing 19,980 shares of common stock out of an aggregate of 20,000 shares then is-

sued and outstanding, being present in person, voted unanimously in favor of the resolution authorizing the transaction and the increase in authorized shares. The Directors, 18 of the 20 being present, voted unanimously in favor of the resolution authorizing the transaction.

Even though no final approval of the transaction by the Superintendent of Banks is required by law, the evidence discloses that he was fully apprised of the transaction and in deference to his view the transfer of assets and liabilities was effected pursuant to the provision of Section 1103.37(B), Revised Code. The Superintendent of Banks also approved and authorized the filing of the Certificate of Change of Corporation Name and the Certificate of Dissolution and caused to be filed with the Secretary of State an executed copy of the Agreement together with all exhibits.

Immediately after the transaction had been consummated, notice in writing was sent by Society and National to each savings depositor of Society at his last known address advising of the transfer of assets and assumption of liabilities.

Subsequently, a notice of such transfer of assets and liabilities was published in the Daily Legal News pursuant to the provisions of Section 8(d) of the Federal Deposit Insurance Act and Section 1103.37(D), Revised Code. A certified copy of such notice was filed with the Superintendent of Banks.

Finally, the insured status of Society under the Federal Deposit Insurance Act was terminated.

From the foregoing, this Court is of the opinion that not only is the transaction legal, but that both Society and National took all the steps required by law to complete the transaction, and that in answer to the first issue this Court finds that the sale of the assets of Society to National was undertaken and carried out in accordance with law.

## ISSUE NO. 2

The second issue propounded to the Petitioner and the Objectors was in four parts. The first part pertained to the bona fides of those persons involved in the undertaking of the transaction; the second, to the reasons for the transaction; the third, to any unjust enrichment which inured to the benefit of any Members, Trustees or Officers of Society or to the benefit of any of the Directors, stockholders or Officers of National, or

to the immediate families of any of said persons; and, the fourth, to whether the transaction inured to the benefit of the depositors of Society.

In *Meinhard* v. *Salmon et al.*, 249 N. Y., 458, 464, 164 N. E., 545 (1928), Justice Cardozo stated:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt* v. *Fischer*, 243 N. Y., 439, 444. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

Applying this standard of conduct to the persons involved in undertaking this transaction, this Court cannot find from the evidence one instance of an abuse of the fiduciary relationship, or of any self-dealing or misconduct on the part of any of the Members, Trustees and Officers of Society, or on the part of any of the Directors, stockholders and Officers of National. This Court finds that these men acted in good faith and for the best interests and welfare of the depositors and Society.

The argument advanced that the transaction was undertaken to preserve control of Society in the hands of the Members and Trustees is certainly not based on the facts. The Members and Trustees were in complete control of Society on December 31, 1958. Existing law and Society's Articles made them self-perpetuating. If they had been intent on perpetuating that control, they had only to vote down the resolution approving the transaction. Instead, they unanimously approved both the transaction and the Plan of Distribution which provided for the termination of such control.

The reasons for the transaction are not important from a legal standpoint so long as the action taken was in good faith, for the benefit of the depositors and Society, and none of the persons involved improperly benefited from the transaction, but this Court feels that the reasons for the transaction are

important to an understanding of why an apparently healthy mutual savings bank entered into this transaction.

It is apparent that the underlying reasons for the transaction lie in the great social and economic changes which have taken place since Society was originally organized in 1849 and particularly since the depression of the 1930's. Originally, only savings banks handled savings accounts. As times changed, the commercial banks acquired the power to handle savings accounts and to perform all other banking functions with the result that they were able to handle all of the banking needs of all types of persons and to advertise that they could perform one-stop banking. Society no longer rendered a unique service.

At a somewhat later date the savings and loan associations, which were originally small cooperative societies formed to assist their members in building homes, gradually changed into large financial institutions vigorously competing with the banks for "savings." After World War II the powers of such institutions to make mortgage loans were broadened to the extent that it was difficult for banks to compete in such field. In addition, such institutions were aided by the establishment of an agency of the federal government to insure their accounts up to the same amount as accounts with banks were insured. As a result, such institutions have grown very rapidly, largely at the expense of savings accounts in other types of financial institutions.

Prior to the depression Society had few competitive problems because of the enviable position in the community which it enjoyed by having weathered the money panics and the great depression, but this advantage was in large part dissipated by the passage of federal deposit insurance legislation. Thereafter, the difference between banks was measured by the number of services which a bank could render to its customers.

In order to adapt itself to such changing conditions, Society, with the approval of the Superintendent of Banks and the proper regulatory authorities, commenced accepting savings accounts from corporations and handling checking accounts as far back as the early nineteen thirties. In 1953 it established its first branch office and in 1954 it acquired seven additional branches by the purchase of the assets and assumption of liabilities of the Bank of Ohio. This, apparently, was the begin-

ning of the difficulties which eventually lead to the transaction heretofore described.

Shortly after the acquisition of the Bank of Ohio representatives of four of the large banks in Cleveland raised a number of questions with respect to the legal power of Society, because it was a mutual bank without stockholders and incorporated under special statutory provisions, to carry on certain of the business in which it was then engaged. Upon refusal of the state regulatory authorities to bring proceedings to determine such questions in the courts, the question was met head on in what is depicted in the record as the "legislative battle of 1955."

The Ohio Bankers Association led the fight against the three mutual savings banks in the State of Ohio and favored legislation preventing these mutual savings banks from accepting demands deposits, (checking accounts), deposits from corporations, and deposits of public funds. Society led the opposition in an effort to enable it to continue the banking functions it had been carrying on before; to save its millions of dollars of demand deposits and, indirectly, millions of dollars of its other deposits.

During the course of this legislative battle, the Members, Trustees and Officers of Society considered four alternative courses for the future of Society. They could liquidate the bank, they could try to continue Society as a mutual savings bank with stripped down powers, they might be able to form a subsidiary bank, or they might undertake to turn Society into a stock bank.

In the end a compromise was arrived at and legislation adopted which prohibited mutual savings banks from accepting or handling deposits of private corporations, of public funds, or demand deposits, but gave them the right to form a trust department and perform all the functions of stock banks.

As a result of the compromise legislation, Society carried on as a mutual savings bank with stripped down powers and formed a subsidiary bank (National) which commenced business January 16, 1956, to perform the services which the mutual bank could no longer perform.

This meant the operation of two separate banks under one

roof which increased expense of operation. It also caused inconvenience and dissatisfaction of customers. The compromise approved by the Ohio Bankers Association apparently was not satisfactory to all its members and opposition continued. A new Superintendent of Banks was opposed to the principle of two banks under one roof and imposed requirements and restrictions which resulted in added expense and duplication of facilities and operations.

Another difficulty pertained to the problem of establishing new branches. Banks have changed basically in their philosophy toward the community. Today they have to serve the people and the community and this necessitates branches. Branch banking was a must and each time Society and National desired to open a new branch it was necessary to obtain the approval of both the Superintendent of Banks and the Comptroller of the Currency because each branch was also two banks under one roof. This resulted in unusual delays and difficulties not experienced by competing banks which were required to obtain the approval of only one of such agencies.

There were only three mutual banks in Ohio and more than 600 stock banks and more than 600 savings and loan associations. The changes in the law made in 1956 clearly indicated that legislative policy was against the creation or enlargement of the powers of mutual banks. There was constant threat of special legislation, both state and federal, which could affect Society's ability to compete with other banks, its tax picture, and its very existence.

The transaction was undertaken in order to escape such problems as well as others not referred to simply by converting to a stock bank. The transaction and the various steps taken pursuant thereto were the legal mechanics by which such result was accomplished.

Whenever a transaction of this kind is made known to the public, it is inevitable that some people will conclude that those on the inside made a ''killing.'' This view was taken by some of the Objectors. However, the record discloses that the Objectors not only thoroughly examined the Members, Trustees and Directors as to their background, knowledge of the transaction, and their business connections, but carefully in-

spected their passbooks or ledger sheets along with those of their wives and all children living at home. No unjust enrichment was discovered, nor was anything unusual found with respect to any of the accounts examined. Furthermore, there was no indication of any deliberate abuse of position or information on the part of any of these men. There were some accounts which had been increased, other than by way of dividends, during the period between December 1, 1957, and December 31, 1958, but no unusual activity was found in these accounts. There was also one transfer of an account from National to Society by a Director in May of 1958. The record shows, however, that such Director did not deliberately make such transfer in order to profit by the transaction.

An objection was raised as to the legality and propriety of the Members, Trustees, Directors and Officers being depositors in Society. There is no rule in law or in equity which precludes a Member, Trustee, Director or Officer from having an account in Society or from participating in the same manner and to the same extent as any other depositor in its remaining assets. The evidence discloses that the Members, Trustees, Directors and a few Officers first became aware of the Plan some time in December of 1957, and knew that every effort would be made to consummate the transaction providing certain conditions precedent could be satisfied. Prior to the transaction these men discussed the feasibility of withdrawing their accounts from Society, but it was agreed that they would carry on as usual because, to do otherwise, might arouse suspicion and result in premature disclosure of the Plan.

There is a provision in the Securities Exchange Act of 1934 which provides an arbitrary rule that an officer, director or holder of more than 10% of the stock of a corporation shall not be permitted to retain a profit made as a result of purchases and sales within a period of six (6) months, regardless of whether such person had or utilized any inside information. See Securities Exchange Act of 1934, 48 Stat., 881 (1934), 15 U. S. C., Section 78p. (b) (1958).

While this section has no application to the subject transaction, this Court has taken into consideration the spirit underlying its adoption, the fact that the Members, Trustees, Directors and Officers had knowledge of the transaction in December, 1957,

and the fact that these men could be open to undue criticism. The Court, therefore, finds that the Members, Trustees and Officers of Society, and the Directors, stockholders and Officers of National, and their immediate families (wives and children living at home) shall not be permitted to participate in the remaining assets of Society to the extent of any increases in their accounts, other than by way of dividends, after December 1, 1957, nor shall they be permitted to participate in said remaining assets to the extent of any new accounts opened by any of such persons in Society after December 1, 1957.

The proposition of unjust enrichment was also raised as to third parties. This Court has examined the record, which includes every deposit of $25,000, or more made during the year 1958, and cannot find any pattern or any single instance which would indicate prior knowledge, or an instance of unjust enrichment.

Apart from the testimony and the evidence, this Court has also considered the fact that even though these proceedings have been going on for almost three years and have been given wide publicity, no one has come forth with any information or evidence which would indicate that any third person benefited by having had advance information of the transaction. There can be no doubt that the transaction was a well-kept secret.

It is not likely that either the Superintendent of Banks or the Comptroller of the Currency would have approved or allowed the transaction to be completed if he had felt that the depositors of Society would have been harmed. Both had ample power to stop it. The record is clear that both were fully informed, actively participated to the extent required of them and in fact stated that in their opinion consummation of the Plan would benefit everyone including depositors. See Pet. Exhs. 11 and 12-C.

From a review of the evidence it is clear that the transaction inured to the benefit of the depositors of Society. In *Society for Savings in the City of Cleveland* v. *Peck, Tax Commr.*, 161 Ohio St., 122, 118 N. E. (2d), 651 (1954), the Supreme Court of the State of Ohio held that the depositors of Society had an intangible ownership interest in the surplus. Such intangible ownership interest, however, could not be with-

drawn, purchased or sold. The transaction changed this intangible ownership interest, which had no value, into a tangible ownership interest which has value and as soon as distributed may be bought and sold.

The Court further finds from the evidence that everything of value which existed at the close of business on December 31, 1958, has not only been retained but has been augmented in value.

It should be noted from the standpoint of the depositors as the owners of intangible ownership interests in Society that as a result of the transaction National, as compared to Society, is a stronger bank, with more complete powers, better equipped to compete in the field of banking, and can no longer be singled out by some legislative act or statutory change induced by competitive pressure.

### ISSUE No. 3

The third issue propounded was directed to the Objectors and pertained to any objections on the part of the Objectors to Society for Savings Company in the City of Cleveland (hereinafter referred to as ''Company'') and the Voting Trust Agreement (hereinafter referred to as ''VTA'').

Company was a corporation for profit organized and existing under and by virtue of the laws of the State of Ohio with authority to issue four hundred thousand common shares with a par value of one dollar each.

The VTA was an agreement dated December 31, 1958 between Petitioner, seventeen Voting Trustees, and Company which created a certain Voting Trust.

In order to understand the importance and necessity of both Company and the Voting Trust, it was necessary to review certain phases of the entire transaction. On December 26, 1958, and prior to the adoption of the resolution to dissolve, Society entered into a written agreement with National which provided, in part, for the cessation of business by Society at the close of business December 31, 1958; the sale and transfer by Society of all of its assets to National in consideration of the assumption by National of all of the liabilities of every kind and description, including deposit liability, of Society; the issuance by National of all of its authorized capital stock, except Directors' qualifying shares, amounting to 119,800 shares, to

Company; the issuance by Company of 287,581 common shares, all of its issued and outstanding shares, and the deposit thereof in the Voting Trust; the issuance by the Voting Trustees and delivery to Society of Voting Trust Certificates evidencing such deposit and the beneficial ownership of said 287,581 shares of Company by Society; and the adoption by Society of a resolution to dissolve and a Plan of Distribution of said Voting Trust Certificates for shares of Company to its regular savings depositors, at the close of business December 31, 1958, in the proportion which the deposit balance of each such depositor, at said date, bore to the aggregate of the deposit balances of all such depositors at said date and computed at the rate of 1/1000th of a Voting Trust Certificate for each dollar of deposit balance standing to the account of each such regular savings depositor at said date.

A review of the objections submitted and filed in this issue clearly indicated that the Objectors failed to take into account certain fundamental factors.

One important factor was that Society was a mutual savings bank organized and existing under the laws of the State of Ohio, and was governed by the provisions of its Articles of Incorporation, its Regulations, Chapters 1109 and 1702, Revised Code, and related Sections of the Statutes of Ohio; that Society had no stockholders and no capital stock; that all voting power was vested in a self-perpetuating body of Members and in a Board of Trustees annually elected by such Members; and that the depositors had no right to receive notice of meetings of Members or Trustees and had no right to vote on any corporate action.

Another factor was that every corporate action taken by Society in this entire transaction was authorized by the unanimous vote of both the Members and the Trustees.

Another factor was that Company would be a large corporation with thousands of shareholders and the number of Voting Trust Certificates for shares of Company to which any one depositor would be entitled would be very small.

A final factor was that Company and the Voting Trust were essential to a sound and workable plan and provided the means for the solution of certain problems which were of prime importance to National and the Comptroller of the Cur-

rency. These problems pertained to the ascertainment of legal title to the stock of National, the continuity of management and a freedom of action during the period of transition, and the creation of fractional interests in National.

The solutions to these problems were necessary in order to obtain the approval of the Comptroller of the Currency. The Comptroller in referring to the first two problems stated in a letter to Society dated August 14, 1958:

"We certainly agree that it is essential in this program that there be provided continuity of management and freedom of action over the necessary period of transition, and, indeed, we could not approve the program without assurance that this would be so.

"* * *.

"In such a situation serious problems might arise under the national banking laws. For example, Section 5205 of the United States Revised Statutes (12 U. S. C., 55), provides that if the capital stock of a national bank becomes impaired by losses or otherwise, the deficiency shall be paid by assessment upon the shareholders pro rata for the amount of capital stock held by each, and that if any shareholder refuses to pay the assessment a sufficient amount of his stock shall be sold at public auction to make good the deficiency. This factor alone makes it most desirable, if not imperative, that the actual proportionate ownership of the stock of the national bank be readily ascertainable, as would be the case if it were owned by a corporation such as the proposed Society for Savings Company, rather than being placed in a trust with the ownership percentages not ascertainable for a period of time and possibly dependent ultimately upon court action.

"* * *.

"Therefore, if the program is to be consummated, we believe that it is necessary that there be created a corporation such as the proposed Society for Savings Company to own the stock of the national bank."

It was also essential during the transition period that legal title to the stock of National could be readily determined in order that National could carry on the normal business of a national banking association.

Continuity of management was not a novel idea as far as Society was concerned. For over 100 years it had been managed by the Members and Trustees who had exercised all of the voting power. It was apparent that the Members and Trustees found it was necessary to retain the powers they had previously exercised over a reasonable period of time to permit an orderly transition from a mutual savings bank to a national banking association. This period would be required for the final determination of all questions that might be raised in the court proceedings, for the distribution of Voting Trust Certificates, and for the establishment of a ready and stable market for said Certificates and thereby prevent speculation activities.

The problem of fractional interests in National was also solved by the means of Company and the Voting Trust, since no plan could be worked out for the direct issuance of fractional shares or rights to fractional shares of National. One of the primary reasons for the problem was that the National Banking Act made no provision at all for the issuance of fractional shares. Furthermore Title 12, U. S. C., Section 52 (1958) required that stock of a national banking association have a par value. The evidence disclosed that on December 31, 1958, Society had approximately 300,000 depositors, of which some 150,000 were school children, whose deposit balances ranged from a few cents to thousands of dollars. The Members and Trustees had determined that any depositor who had one dollar on deposit was entitled to his proportionate intangible ownership interest in the remaining assets in the same manner as a depositor who had many thousands of dollars on deposit. Society at that time had more than $287,000,000.00 in regular savings deposits, so if the Plan provided for every depositor down to the last dollar of his deposit, it would have been necessary either to have issued 287,000,000 shares or to have provided for the creation of fractional shares.

The question of the legality of the entire transaction was again raised in this issue. The legality question was resolved in issue one and this Court found, in part, that Sections 1109.03 and 1702.39, Revised Code, clearly provided the authority for Society to transfer all of its assets not only for money but for other property, including shares in other securities of any corporation for profit, domestic or foreign, as authorized by the

Board of Trustees and approved by the Voting Members. Section 1702.49, Revised Code, when read in connection with the above two sections established the authority for the Plan of Distribution and the Voting Trust Certificates.

Two specific objections were submitted with respect to the Articles of Incorporation of Company. The first pertained to the authorized but unissued shares. The Articles of Incorporation provided that the authorized number of shares of Company was 400,000 and to date 287,581 shares have been issued. The evidence disclosed that the additional shares were authorized solely for the purpose of providing flexibility in the operation of National and for any contingencies that might arise such as the need for additional capital. Fear was expressed that the Voting Trustees and the Directors of Company might manipulate these shares for their own personal gain. This Court finds that there is ample protection under the law against this type of action on the part of the Voting Trustees or the Directors. Any sale of the unissued shares must have a proper corporate purpose and must be sold at the best price obtainable. Any attempt to sell such shares to the Voting Trustees for the purpose of gaining control of Company or for personal gain would be a breach of their fiduciary duties and would either be enjoined or set aside by the courts.

The other objection pertained to pre-emptive rights. The Articles of Incorporation of Company provided that the stockholders of Company had no pre-emptive rights. It was argued that the denial of pre-emptive rights could result in additional shares of Company being issued to the Voting Trustees without first offering them to existing stockholders of Company, that it could result in a loss of proportionate voting control if more shares were issued, and that the value of existing shares would be decreased if a new issue were sold at a deflated price. This Court finds that none of these arguments takes into consideration the legal, economic and policy factors underlying the denial of such rights.

The evidence disclosed that few public issue corporations are organized today in which pre-emptive rights are preserved to the stockholders. It has been found that application of the doctrine might hamper legitimate corporate financing, that the delay and expense involved in offering a new issue of shares to

thousands of shareholders, some with very small holdings, may be prohibitive, and that the doctrine in the long run works to the disadvantage of the shareholders, whose basic rights are adequately protected by the enforcement of the fiduciary duty of the directors.

This Court finds that the denial of pre-emptive rights is authorized by Section 1701.15, Revised Code, and that rather than apply the doctrine of pre-emptive rights, it is more effective to hold directors to high standards of good faith and fairness in issuing additional shares.

Objections were also filed as to the validity of the Voting Trust and the VTA. Section 1701.49, Revised Code, expressly authorized the creation of voting trusts. The fact that there is such a statute should dispel any arguments that voting trusts are against the public policy of Ohio. This section provides that a written agreement be entered into setting forth the terms and provisions of the voting trust. A written agreement was entered into between Society, the Voting Trustees, and Company. Society, which then owned and held all the outstanding shares of Company, deposited said shares with the Voting Trustees and received from them Voting Trust Certificates for said shares. This action was unanimously approved by the Members and Trustees of Society and the Agreement was executed prior to the time when Society was dissolved. No consent of the depositors was required, since none of the depositors owned any stock of Company and none of the depositors had a right to vote with respect to such action by Society.

Some of the Objectors have filed objections to certain terms and provisions of the VTA. The Court has carefully considered each of such objections together with changes proposed by such Objectors. The terms and provisions of the VTA were designed to give to the Voting Trustees only the same powers and privileges which they had as Members of Society during a reasonable period in which to fully complete the change from a mutual savings bank to a stock bank. It is the opinion of this Court that a reasonable period is needed for such purpose and that the terms and provisions of the VTA are valid and fair. This Court is of the opinion, however, that in view of the change

to a stock bank the Voting Trustees should not in the future vote for or consent to the adoption of a plan of reorganization; the lease, sale, exchange, transfer or other disposition of all or substantially all of the property and assets belonging to the Trust; a merger, sale consolidation, dissolution or liquidation, of either National or Company, without the affirmative vote or consent of the owners of not less than 55% of the Voting Trust Certificates for shares of Company actually outstanding.

The Court is advised that since December 31, 1958, the number of Voting Trustees has been reduced, by death, and incapacity. It is the opinion of this Court that the Voting Trustees should take such action as may be necessary under Sec. 15(b) of the VTA to elect the following named persons to serve solely as Voting Trustees:

Morris Abrams, President, Curtis Industries, Inc.

Walter K. Bailey, President, The Warner & Swasey Company.

Jack H. Green, President, The Progressive Mutual Insurance Co.

Allen J. Lowe, General Manager, Sheraton-Cleveland, and

R. H. Norweb, Jr., Director, Holden Arboretum.

Finally, the Court is of the opinion that the provision which would permit the extension of the VTA for an additional period of ten years upon the affirmative vote or assent of the owners of not less than a majority of the Voting Trust Certificates deposited thereunder is not necessary and should be deleted.

The Plan of Distribution made no provision as to what should be done with scrip for Voting Trust Certificates which had not been combined into full shares within the three-year period specified in the Plan. Determination of such question was left open dependent upon the decision of this Court with respect to the ultimate disposition of Voting Trust Certificates, the owners of which could not be found. It is the opinion of this Court that at the end of the three-year period in which such scrip certificates may be combined into Voting Trust Certificates for whole shares, such right of combination should cease; the Voting Trust Certificates represented by such uncombined scrip should be sold on the open market at the best price obtainable and the proceeds thereof should be allocated

among the owners of such uncombined scrip in the proportion which each uncombined scrip certificate bears to the total of all the uncombined scrip certificates entitled to share in the proceeds of such sale. If any of the persons entitled to a share in such proceeds shall then have an open savings account in National, such proceeds shall be deposited in such account, otherwise such proceeds shall be paid by check. If any of such persons cannot be located the cash distributable to them shall be deposited with the Trustee of the Trust provided for in connection with Issue No. 6, to be held and disposed of by it in accordance with the terms and provisions of such Trust.

The provision of the Plan of Distribution concerned with the amount required to be on deposit as of December 31, 1958, in order to entitle a depositor to receive one full Voting Trust Certificate for a share of stock of Company will be dealt with in connection with Issue No. 7.

Petitioner shall prepare all such amendments to the VTA and to the Plan of Distribution which may be necessary to carry out the foregoing and shall submit the same to this Court for its approval.

## ISSUE No. 4

The fourth issue propounded to the Petitioner and Objectors was:

"What persons, or classes of persons, are entitled to share in the distribution of the remaining assets of Petitioner, Cleveland Savings Society?"

This issue included the determination of the rights of depositors, former depositors, including corporate depositors, political subdivisions as owners of public deposits, persons owning or interested in Christmas Club accounts, escrow accounts, Employees' United States Savings Bond deposits, funds held for borrowers, borrowers' construction loan funds, hypothecated deposits on installment loans, outstanding certified checks and outstanding checks, official checks, other depositors or creditors of Petitioner, and other persons who may have or claim to have rights, interests or liens, in, to or upon the assets of Petitioner of a kind or nature unknown to it. There is nothing in either the Articles or regulations of Society or in Chapter 1109, Revised Code, which would dispose of the question propounded.

The Plan of Distribution adopted by Petitioner pursuant to Chapter 1702, Revised Code, provided that the only persons entitled to share in the distribution of the remaining assets of Petitioner were savings depositors having deposit balances as of the close of business December 31, 1958. The Plan of Distribution reads, in part, as follows:

"1. The term 'Depositor' as used herein shall mean any person holding, or entitled to hold, a savings passbook issued by Society pursuant to the rules and regulations relating to savings accounts promulgated by it which, if fully posted to reflect all deposits in and withdrawals from the account represented by such passbook to the close of business December 31, 1958, and immediately prior to the assumption by National of the deposit liabilities of Society, would show a credit balance in favor of such person. The term 'Deposit Balance' as used herein means the amount of the credit balance in the account of any Depositor.

"2. The term 'Surplus' as used herein shall mean the net assets of Society over and above its debts and deposits. At the time of the adoption of this Plan such Surplus consists of Voting Trust Certificates evidencing the ownership of 287,581 shares of the Common stock of Society for Savings Company in the City of Cleveland.

"3. Subject to the approval of the court in the Special Action hereinafter provided:

"(a) The Depositors, as of the close of business December 31, 1958, and no other persons, are the beneficial owners of, and are entitled to receive distribution of the Surplus of Society."

Some of the Objectors have asserted that former depositors, whose deposits were withdrawn, but whose deposits, while they were in the bank, helped to build up the surplus assets of the institution, should share in the distribution of the remaining assets. This Court has carefully reviewed the history of Society and of mutual savings banks generally, Society's Act of Incorporation, the Certificate of Reincorporation, the Regulations and Rules relating to deposits, and the various statutes applicable to Society and cannot find any legal basis for this assertion.

The right and duty of Society to accumulate and hold a surplus were set forth in the Act of February 15, 1877, 74 O.

L., 26, in Section 710-148e, General Code, and in Sections 1109.10 and 1109.17, Revised Code, and it was clearly indicated that such surplus was to be held primarily for the protection of the then current depositors as distinguished from former depositors. There would certainly be no reason to maintain a surplus for the protection of former depositors whose deposits had been withdrawn.

In *Society for Savings in the City of Cleveland* v. *Peck, Tax Commr.*, 161 Ohio St., 122, 118 N. E. (2d), 651 (1954), the majority opinion asserted that the present depositors owned the capital, surplus, reserve fund and undivided profits of a financial institution without shares. The court stated, at page 137, that:

"With respect to that species of intangible property which represents the ownership interests in a corporation, the capital of which is not divided into shares or which has no capital stock, payment by the financial institution of the tax will always in effect amount to payment by those who are the beneficial owners of such intangible property. Such payment will necessarily reduce the amount, which the corporation will have available for payment of interest to depositors or holders of withdrawable shares and which will be available for protection of their deposits or stock claims and for distribution to them in the event of liquidation of the corporation. Thus, the financial institution, which pays the tax on their property interests in the corporation, will always be able to reimburse itself by reducing the ultimate value of the property interests of those who are the only ones who can have any claim to benefit from the ownership interests taxed.

"Payment by the corporation of the tax on their intangible ownership interests in the corporation will necessarily reduce, to the extent of the payment made, those funds available for payment of interest on their deposits, and will likewise reduce the amount available only to them in the event of liquidation of the corporation."

The court, in that part of the majority opinion quoted above, indicated that any assets remaining for distribution in the event of liquidation of Society would be distributed to those persons who had deposits in the bank at the time of liquidation.

318

Judge Stewart, in his dissent in *Peck*, made it clear that the basis for the majority decision was that the "present depositors" owned the surplus.

This Court is of the opinion that the surplus was created and maintained in the main for the protection of the existing depositors from loss and that when any person ceased to be a depositor his interest in the surplus was at an end. Such person was no longer liable to contribute to any loss to which the remaining depositors might be subjected, nor had he any right to receive further dividends.

With respect to the intangible ownership interest of the depositors of Society, the Supreme Court of the United States in the case of *Society for Savings in the City of Cleveland* v. *Bowers, Tax Commr.*, 349 U. S., 143 (1955), at page 150, stated:

"The asserted interest of the depositors is in the surplus of the bank, which is primarily a reserve against losses and secondarily a repository of undivided earnings. So long as the bank remains solvent, depositors receive a return on this fund only as an element of the interest paid on their deposits. To maintain their intangible ownership interest, they must maintain their deposits. If a depositor withdraws from the bank, he receives only his deposits and interest."

A case which squarely meets the question of former depositors is *Morristown Institution for Savings* v. *Roberts et al.*, 42 N. J. Eq., 496; 8 Atl., 315 (1887). This case involved a suit by the trustees to obtain instructions from the court as to the disposition to be made of the surplus of a mutual savings bank which had gone into voluntary liquidation and had paid all of its deposits and other liabilities. Among the defendants were representatives of persons who were depositors when proceedings for winding up the institution were instituted and those who before that time were depositors but had withdrawn their deposits and were not depositors when the dissolution proceedings were instituted. The charter did not specify as to how surplus funds should be distributed in liquidation. It was held that the surplus belonged to those depositors who had deposits when the dissolution proceedings were commenced, to the exclusion of all those who had withdrawn their deposits prior to that time. The court, at page 498, stated:

"The state has no right to the surplus. Nor have those who were depositors, but withdrew their deposits before the institution of the winding-up proceedings, any claim to it. The surplus was created and maintained for the protection of the depositors from loss by reason of the depreciation of securities etc. etc., to protect them against the casualties and contingencies to which the funds of the institution were liable, and which might impair their deposits. It stood as such indemnity for the depositors who were such for the time being. So long as a person continued to be a depositor, so long it stood for his protection, and when, by withdrawing his funds, he ceased to be a depositor, his interest in it was at an end. He thus relinquished his interest in it, and as he would not be liable to contribute to any loss to which the remaining depositors might be subjected, so, on the other hand, he would not be entitled to any participation in the surplus.

"The thirty-second section of the act concerning savings banks (*P. L. of 1876, p. 352*) makes it the duty of the managers of every corporation subject to that act to regulate the rate of interest or dividends, not to exceed six per centum per annum, upon the deposits, in such manner that depositors shall receive, as nearly as may be, all the profits of the corporation, after deducting necessary expenses and reserving such amount as the managers may deem expedient as a surplus fund for the security of depositors, which, to the amount of fifteen per centum of their deposits, the managers are thereby authorized to accumulate gradually and to hold, to meet any contingency or loss in the business of the corporation from the depreciation of its securities or otherwise. It provides also that it shall be the duty of the managers of any such corporation, the surplus of which amounts to fifteen per centum of its deposits, to divide equally, at least once in three years, the accumulation beyond the authorized surplus as an extra dividend to depositors in excess of the regular dividends authorized by the act. This latter provision is a legislative recognition of the principle that the surplus which a savings institution has, when wound up, belongs to those who are the depositors at that time. Those depositors being the only persons interested in the assets of the corporation at the time of winding up are entitled to a ratable distribution among themselves, according to the amount of

their respective deposits, of those assets, after paying the debts of the corporation to other creditors. In *Hannon* v. *Williams*, 7 Stew. Eq., 255, it was said by the court of errors and appeals that in prosperity the depositors of a savings bank are the stockholders among whom profits are divided."

This view was also expressed in the case of *Mechanics' Savings Bank* v. *Granger, City Treasurer of the City of Providence*, 17 R. I., 77, 20 Atl., 202 (1890), wherein the court stated at page 79:

"It seems to us that the same reasons that led the court to hold in *The American Bank* v. *Mumford, supra*, [4 R. I., 478], that the reserved profits of a bank of discount belong to its stockholders, would likewise lead to the conclusion that the reserved profits of a savings bank belong to its depositors. The reserved profits are a part of the earnings of the deposits, reserved for the purpose of facilitating the management of the bank's affairs, and of imparting greater steadiness and security to its operations in periods of financial depression and disaster. There is no way in which the ownership of them can pass from the depositors to the bank under its charter by reason of such reservation. It is true that the depositor, when he withdraws his deposits, cannot draw upon the reserve for his part, but he gets the benefit of it in the safety of his deposit, in an increase of dividends, and in freedom from fluctuations in the receipt of them. That he cannot withdraw any part of the reserve, when he withdraws his deposit, is owing to the terms under which, by force of the charter and by-laws, his deposits are given and received. The board of trustees may, however, as we have seen, vote to divide 'the whole property among the depositors in proportion to their respective interests therein.' In case of such a vote the then depositors would get their proportionate shares of the reserve, if any there were after repayment of their deposits in full, and neither bank nor trustee could retain a cent. This provision in itself shows conclusively that, in contemplation of law, the reserved profits belong to the depositors, not to the bank."

This Court has been directed to numerous other cases, statutes and texts establishing, directly or indirectly, the principle that the persons entitled to share in the remaining assets of a mutual savings bank are those persons who have deposits in the bank at the time of winding up. Comment on such authorities is unnecessary. Objectors have not cited one case to the contrary.

A review of the case law and the applicable statutes of the State of Ohio clearly indicates that former depositors are not entitled to share in the distribution of the remaining assets of Petitioner, and this Court hereby denies the claims of that class of persons.

Of the remaining persons or classes of persons which the Court has stated would be included in this issue, only a few have filed claims with the Court. These claims pertain to public funds and official checks and one relates to the rights of a former corporate depositor.

It appears to this Court that for any persons, or classes of persons, to be entitled to share in the distribution of the remaining assets of Society, it would be incumbent on them to show in a solvent dissolution of this kind that not only a debtor-creditor relationship had been created, but also that an intangible ownership interest in the surplus had been created. Only those persons who indicated an intention to become regular savings depositors, who received savings passbooks as evidence of their property interest in Society, who were entitled to receive dividends rather than interest, or nothing, whose right to withdraw their funds was determined in accordance with the regulations and Rules Relating to Deposits (see Pet. Exr. 1-D), had intangible ownership interests in Society.

Persons owning or interested in Christmas Club accounts, escrow accounts, Employees' United States Savings Bond deposits, funds held for borrowers, borrowers' construction loan funds, hypothecated deposits on installment loans, outstanding certified checks, outstanding checks, and official checks did not meet the requirements necessary to create an intangible ownership interest. Contracts with such persons were special contracts which distinguished them from regular savings deposi-

tors. They had no savings passbooks in Society, received no dividends from Society and their right, if any, to demand payment of such funds was determinable in accordance with their special contracts or general law and not governed in any way by the regulations and Rules Relating to Deposits. Therefore, this Court finds that these persons, or classes of persons, shall not be entitled to share in the distribution of the remaining assets of Petitioner.

Public funds were held by Society for the account of certain municipal corporations pursuant to special written contracts which were governed by the provisions of the Uniform Depositary Act of the State of Ohio. These contracts provided for the payment of a fixed rate of interest, the repayment of all money held, and were fully secured by obligations of the United States of America. In light of the distinctive nature of these deposits, as contrasted to the regular savings deposits in Society, this Court finds that this class of depositors shall not be entitled to share in the distribution of the remaining assets of Petitioner.

The evidence disclosed that prior to July 1st, 1956, Society accepted regular savings accounts from corporations for profit, but effective July 1st, 1956, Section 1109.05, Revised Code, as amended, prohibited Society from accepting such deposits. The record further disclosed that as of December 31, 1958, Society had no regular savings accounts in the name of corporations for profit. In view of the above and the finding of this Court as to former depositors, this Court finds that no former corporate depositors are entitled to share in the distribution of the remaining assets of Petitioner.

It is the finding of this Court as to issue number four that the only persons entitled to share in the distribution of the remaining assets of Petitioner were savings depositors having deposit balances at the close of business December 31, 1958.

It has been suggested that another date be used because of the hardships suffered by some depositors and the further fact that information of the transaction may have been disclosed to some individuals prior to the closing date. As to the latter, this Court has found that the Members and Trustees of Society had a right to do what they did and that the transaction was a well-kept secret. This Court is very cogni-

zant of the fact that the cut-off date worked hardships on some and that it created windfalls for others. The same would be true if any other date were selected. Moreover, there is no legal basis for making any date other than December 31, 1958, the effective date.

## ISSUE NO. 5

The fifth issue propounded to the Petitioner and the Objectors was:

"How is each depositor's share in the remaining assets of Petitioner, Cleveland Savings Society, to be determined?"

This issue is closely allied to the fourth issue.

The Plan of Distribution adopted by Petitioner pursuant to Chapter 1702, Revised Code, reads in part as follows:

"3. Subject to the approval of the court in the Special Action hereinafter provided:

"(a) The Depositors, as of the close of business December 31, 1958, and no other persons, are the beneficial owners of, and are entitled to receive distribution of the Surplus of Society.

"(b) As between the several Depositors, such Surplus is beneficially owned by them in the proportion which their respective Deposit Balances bear to the aggregate of the Deposit Balance of all Depositors."

The authorities which this Court has reviewed clearly indicate that the intangible ownership interest at any given time is in the proportion which the Deposit Balance of each Depositor bears to the aggregate of the Deposit Balances of all Depositors, and it follows that the distribution of the remaining assets must be in the same ratio as such intangible ownership interests. This was determined by the Supreme Court of Ohio in *Society for Savings in the City of Cleveland* v. *Peck Tax Commr.*, 161 Ohio St., 122, 118 N. E. (2d), 651 (1954).

This method of distribution of the remaining assets was set forth in the case of *Morristown Institution for Savings* v. *Roberts et al.*, 42 N. J. Eq., 496, 8 Atl., 315 (1887). The court in referring to depositors at the time of the winding up of the savings institution stated at page 498:

"Those depositors being the only persons interested in the assets of the corporation at the time of winding up are entitled to a ratable distribution among themselves, according to

the amount of their respective deposits, of those assets, after paying the debts of the corporation to other creditors."

In discussing mutual savings banks in the State of Connecticut, the Court in *Alexiou* v. *The Bridgeport-Peoples Savings Bank*, 110 Conn., 397 (1930), stated at page 400:

"Savings banks in this state are incorporated agencies, without capital stock, for receiving and loaning the money of depositors, and the assets of the corporation belong to all the depositors in proportion to their deposits."

In *Nashua Savings Bank* v. *The City of Nashua*, 46 N. H., 389 (1866), the court in referring to the depositors in savings banks, stated at page 399:

"They own the whole property and capital in shares proportioned to the amount of their respective deposits, as much as the shareholders or stockholders in any other corporation; . . ."

In analyzing the nature of the rights of depositors in mutual savings banks, a number of the authorities reviewed have drawn an analogy between the intangible ownership interest of depositors in a mutual savings bank and the tangible ownership interest of stockholders in a stock corporation. This would further indicate a legal basis for the determination of a pro rata distribution of the remaining assets.

A like view has been taken by those states which have specifically covered the question raised by this issue by legislation. A typical example is the State of New Jersey. See N. J. Stat. Ann., 17: 9A-284A, Distribution, at page 339 (1950):

"The proceeds of the liquidation of the assets of a bank, the property and business of which the commissioner has taken possession, shall be distributed according to the priorities and preferences provided by Chapter 14 of Title 14 of the Revised Statutes; except that, in the case of a savings bank, the surplus remaining after the payment or provision for the payment of all of its liabilities, claims and deposits, with interest or dividends to the date when possession was taken by the commissioner, and payment of or provision for all expenses upon final distribution, shall be divided pro rata among its depositors according to the amounts of their deposits at the time such possession was taken by the commissioner."

The Objectors have submitted a number of plans or methods

of measuring the share of such persons who are found to be entitled to share in the remaining assets of Petitioner. Some of the plans were based on the theory that the right to share in the remaining assets was based upon a contract which provided that such share would be measured by the proportion which the deposit of each depositor contributed to the accumulation of the surplus. In determining the contribution to surplus, consideration in each instance was given to the amount of the deposit and the length of time the deposit remained in the bank. Since the amount fluctuated during the time period, provision was made for a method of averaging. Variations in these plans pertained to the maximum time period, methods in arriving at the amount, and the methods of averaging.

One of the plans submitted set forth that the only persons entitled to share were depositors on December 31, 1958, and proposed that each qualified depositor be given an equal share. This Court finds that such proposal is unrealistic, and has no basis in either law or equity.

Another plan submitted proposed that the share of each depositor be determined by the proportion which the aggregate amount of dividends paid to each depositor during a given time period, as may be fixed by some cut-off date, bears to the aggregate dividends paid to all depositors during the same given time period. This plan is based on the assumption that dividends paid are a fair measure of contributions to surplus. From the evidence adduced, there was a clear showing that in each of the years 1931 to 1958, inclusive, there was no relationship between the dollar amount of dividends paid and the dollar amount of increase or decrease of surplus in any year or over any period of consecutive years during said period. The evidence also disclosed that there was no relationship whatever between the rate at which dividends were paid and the rate at which amounts were added to or taken from the surplus. The evidence further disclosed that from 1878 to 1950 Society paid a split dividend rate. This factor alone would nullify the assumption that dividends paid are a fair measure of contributions to surplus. This Court finds that such proposal is based on an arbitrary cut-off date and time period, is fundamentally unsound, and is inconsistent with the finding of this Court that the only persons entitled to share in the distribution of the

remaining assets of Petitioner were savings depositors having deposit balances at the close of business December 31, 1958.

A compromise suggestion was submitted which proposed that the remaining assets be distributed as extra dividends payable retroactively in the same amounts as regular dividends have been paid. Each depositor who received a dividend on December 31, 1958, would be paid an extra dividend in the same amount, each depositor who received a dividend on June 30th, 1958, would receive an extra dividend in the same amount, and continuing on backwards at each dividend payment date the dividend would be matched with an extra dividend until the fund to be distributed was exhausted. This Court finds that such a proposal would only compound the inequities inherent in the so-called dividend plan.

Another plan submitted proposed that the share of each depositor be determined in the proportion which the average of said depositor's December 31st balances for each year in which he had a deposit during the given time period bears to the average of the December 31st balances of all depositors during the same given time period. The variations in this plan are primarily concerned with the maximum time period to be considered which varied from 5 to 25 years. From the evidence submitted it was clear that if any other date or any other time period were selected for use in computing such averages, an entirely different result would be obtained. The evidence also disclosed that any depositor who opened his account after January 1st of any year and closed it before December 31st of the same year would receive nothing, and any depositor who opened his account in the first quarter of one year and closed it in the last quarter of the following year would only receive a time credit for 12 months. The evidence further disclosed that if any averaging method was to be used, the only accurate method of determining amount would be an average daily balance over the entire given time period. The work and expense involved in this latter method would be prohibitive. This Court finds that such proposal is based on an arbitrary time period and balance date, and that as a measure of contribution to surplus is inaccurate and inequitable, and that it is inconsistent with the findings of this Court that the only persons entitled to share in the distribution of the remaining

assets of Petitioner were savings depositors having deposit balances at the close of business December 31, 1958.

One of the Objectors has suggested that a simple average be taken of the share as computed by each of the last two plans. This Court finds that if it were attempting to measure contribution to surplus, the use of an average, instead of minimizing the errors in each plan, would result in a multiplication of such errors.

Another plan submitted proposed that the share of each depositor be determined on the basis of annual increases in surplus. This would be in the proportion which the average deposit of each depositor for each year of the period over which Society's remaining assets were accumulated bears to the average deposit of all depositors for each year of the same time period. From the evidence adduced, this plan came closer, in theory at least, than any of the others. to a measure of contribution to surplus, but it was impractical and impossible of application. In the first place, the proportion part of the formula required a daily average balance for each depositor over the given period, and this Court has indicated its position with respect to any project of this kind. Secondly, in order to determine annual increase in surplus it is clear that only book values could be used as it would be impossible to reconstruct annual earnings. The evidence disclosed that on the basis of book values both net worth and surplus existed at the end of every year from 1852 to December 31, 1958. This meant that the time period would have to go back to 1849. This Court finds that such proposal is impractical and impossible to apply and further finds that it is inconsistent with the finding of this Court that the only persons entitled to share in the distribution of the remaining assets of Petitioner were savings depositors having deposit balances at the close of business December 31, 1958.

It is apparent from a review of the various plans submitted that it is impossible to arrive at a fair and practical method of determining contribution to surplus. Furthermore, the use of any one plan or any one cut-off date or time period would be purely arbitrary. Finally, there was no legal authority in support of any one of Objectors' plans.

It is the finding of this Court, therefore, that the remain-

ing assets belong to those who had intangible ownership interests at the close of business December 31, 1958, and must be distributed to such persons in proportion to their respective intangible ownership interests.

## ISSUE NO. 6

The sixth issue propounded to the Petitioner and the Objectors related to the problem of unclaimed deposits, and requested answers to the questions of what constitutes unclaimed deposits, the legal status of unclaimed deposits, and what disposition should be made of such deposits.

Certain Objectors have maintained that there is statutory authority to the effect that this Court must take some action with reference to so-called unclaimed deposits. A review of the Banking Laws of Ohio, Chapters 1101 to 1117, inclusive, Revised Code, discloses only two sections in which reference is made to unclaimed deposits. Neither of these sections are applicable to the facts in these proceedings. The one section, Section 1103.36, paragraph one, Revised Code, deals with the situation where a bank is undergoing liquidation, has ceased to carry on business, its deposit liability has not been assumed by another bank, its assets are sold piecemeal and the proceeds thereof are paid to creditors, depositors and shareholders in the form of liquidating dividends. In such a case the statute necessarily provides custodial facilities for unclaimed deposits in order to permit final winding up. Where deposit liability is assumed by a going bank no such facilities are provided because the going bank has assumed and stands ready to pay all such liabilities on demand. The other section, Section 1113.-20, Revised Code, has application only in the situation where the Superintendent of Banks takes possession of a Bank under certain circumstances and pursuant to specific statutory authority. Both of these sections deal with specific types of liquidations which are not involved in these proceedings.

The transaction involved herein was undertaken and carried out pursuant to Section 1103.37(B), Revised Code. Acting under the authority of that section Society sold and transferred all of its assets and liabilities to National, and National assumed all of the liabilities of Society of every kind and description, including deposit liability. As a result, after De-

cember 31, 1958, Society had no deposits and consequently had no unclaimed deposits. All deposits became legal and enforceable claims against National.

Certain Objectors have taken the position that particular account classifications established by Society and continued by National, such as dormant accounts and inactive accounts, should be considered as unclaimed by this Court. The evidence disclosed that the classifications given to these accounts were created solely for the purpose of internal accounting controls; that these classifications were not required by law or by any regulatory authority; and that whenever the owners of such accounts presented their passbooks the accounts were reclassified as active and any service charges were remitted. Furthermore, by reason of the nature of the transaction, depositors were not required to make any claims with respect to their deposits. Certainly these accounts cannot now be classified as unclaimed deposits for any legal purpose, any more than any other deposits can be so classified. Nor can they be classified as unclaimed deposits any more than the same types of deposits in any other bank.

There is no law at the present time which covers such classes of accounts. Prior to 1947, however, there were statutes in Ohio, Sections 9864-9872, General Code, which provided certain custodial procedure for deposits belonging to unknown depositors. In 1931, these statutes were declared unconstitutional in the case of *State, ex rel. Millikan,* v. *Cook, Clerk of Courts,* 41 Ohio App., 149 (1931), affirmed by the Supreme Court of Ohio in *State, ex rel. Millikan,* v. *Cook, Clerk,* 125 Ohio St., 206 (1932). In the latter case, the Supreme Court, in referring to unknown depositors, stated at page 208:

"The term 'unknown depositors' is a plain absurdity. The deposit, accompanied by the usual deposit slip, at once identifies the depositor and the entry on the books of the bank of this credit to the depositor preserves the evidence of his identity. True, the bank may not know at all times the exact whereabouts of all of its depositors; but the bank does know at all times who they are. The depositor cannot be both known and unknown at the same time.

"If mere lapse of time alone can change a known depositor into an unknown depositor, then that result must affect and

embrace all the depositors alike, and it would follow that all the officers, all the stockholders, and all the employees of the bank may, by becoming depositors, become unknown depositors of their own bank, and they might witness a change, not only in the possession, but of the title as well, of their deposits by the mere lapse of time, aided by legislative enactment, and wholly without their consent. And they might also witness the impairing and destroying as well of the contract between the depositor and the bank, which arises out of the mutual acts of the only parties to the contract, the depositor and the bank. Surely no one will ever say that the author of the Unknown Depositors Law, so-called, was lacking in either imagination or thrift."

In 1947, Sections 9864-9872, General Code, were repealed (122 O. L., 128), and no new statutes relating to this subject have ever been enacted, so that there is no statutory law at the present time in Ohio which provides special treatment for old or inactive accounts in going banks.

Certain Objectors have urged that because Society transferred its assets and liabilities to National all depositors of Society, as of the date of the transaction, should be required to consent to the transfer or to present their passbooks and that those who have not done so within a period of time to be set by this Court shall be treated as unclaimed deposits. There is no provision in either Section 1109.14 or Section 1103.37(B), Revised Code, requiring notice to or consent by depositors, the making of claims or the presentation of passbooks.

There are no unclaimed deposits to be disposed of in these proceedings.

While the transaction operated to provide for the payment of all of Society's deposit liability through the assumption thereof by National with the result that Society no longer has any deposits, it does have assets (Voting Trust Certificates for shares of Company) remaining for distribution to the owners of Intangible Ownership Interests. Such assets are not unclaimed since distribution has not yet begun. Because there are more than 300,000 of such owners and because the evidence indicates that the present addresses of some of such persons are unknown, it will not only take time and effort to

locate some of such persons but some, in all probability, will not be found.

This Court is therefore presented with the problem of how to dispose of the shares of persons who are not located. At this time it is impjossible to estimate how many of such persons will not be found. The evidence clearly indicates that even where accounts have been classified as inactive or dormant because there has been no activity for seven years, a substantial number of such persons are eventually found or appear to claim their accounts. For this reason every reasonable effort must be made to locate every person entitled to share in the remaining assets of Society and ample time must be allowed to accomplish such purpose.

Certain of the Objectors argue that after a reasonable period of time to be fixed by the Court and notice to all owners of Intangible Ownership Interests to appear and claim them, the interests of all persons who cannot be found or fail to appear should (1) be paid over to the County Treasurer along with unclaimed deposits, (2) escheat to the State of Ohio, or (3) be barred by this Court. The latter proposal would result in distributing the interests of those persons whose rights were barred among the remaining owners of Intangible Ownership Interests.

Objectors' arguments with respect to the applicability of Sections 1103.36 and 1113.20, Revised Code, have already been disposed of.

The question of what is to be done with the share of a depositor who cannot be located is identical to the problem of what shall be done with the interest of a shareholder in a dissolved profit corporation when such shareholder cannot be found and makes no claim for his interest.

Ohio statutes do not specifically deal with such problem. Chapter 2101, Revised Code, dealing with the estates of persons presumptively deceased and the escheat provision in the statute of descent and distribution, Section 2105.06(J), Revised Code, would require the State, in the case of each particular owner who cannot be found, to show that it is entitled to bring an action to have such person declared presumptively deceased, establish the lack of heirs and comply with all elements of proof, etc., required by such statutes. Such actions must be brought on

an individual basis and clearly have no applicability to the present proceeding.

While Section 1701.24, Revised Code, provides, in effect, for a six-year statute of limitations upon a shareholder's claim to unclaimed cash dividends, the statute makes no provision whatever with respect to the disposition of interests in the remaining assets of a corporation which belong to persons who cannot be found.

A few states provide for such a result by special statute. Such states are in the minority and there is no such statute in Ohio.

This Court has not been directed to any authority establishing the existence of a common law rule of general escheat in the State of Ohio or the existence of any Ohio authority which would justify the barring of the interests of unlocated owners or which would permit the distribution of such interests to anyone other than the true owners.

It is urged that the state has a right to receive all such property based on the theory of a resulting trust. In the opinion of this Court, no resulting trust can arise under the facts of this case. The owners of the property interests involved are not unknown. On the contrary, they are known. They merely have not appeared or have not been found. They may appear or be found at any time. There is no provision in either Chapter 1109 or Chapter 1702, Revised Code, which provides that property distributable to known persons who have not been found should either escheat to the State of Ohio or pass to it under a resulting trust.

In the absence of statutory or common law authority in the State of Ohio with respect to unclaimed share interests, this Court is of the opinion that the only thing which can and should be done with such interests is to hold them in trust until the rightful owners or their duly authorized representatives appear or are found. This can best be accomplished by creating a trust with Society National Bank of Cleveland as trustee. It is therefore the opinion of this Court that the interests of persons who have not been found and who do not appear within seven years from the date on which the decree herein becomes final shall be deposited with the Trust Department

of the Society National Bank of Cleveland, in trust, to be held by it for the benefit of the rightful owners thereof or their duly authorized representatives when they shall appear or shall have been found, under terms and conditions to be approved by this Court. Petitioner shall prepare and submit for the approval of this Court a formal trust agreement containing such provisions as it considers necessary or proper, including a provision requiring the periodic publication of the names and last known addresses of all such persons who have not been found, in daily newspapers of general circulation printed in the City of Cleveland, Cuyahoga County, for final approval by this Court.

## ISSUE NO. 7

The seventh issue propounded to the Petitioner and the Objectors was:

Should the plan be revised with respect to distribution of scrip certificates and should it provide that the share of this class of depositors in the remaining assets of the petitioner, Cleveland Savings Society, be distributed in cash?

Should the plan provide that the share of the approximately 150,000 school children depositors who have not attained legal age be distributed in cash?

It is intended that this issue shall include the determination of the manner in which any such distribution shall be effected.

A few of the Objectors have argued that the Plan should be revised so as to pay off all small depositors in cash. To do this would require the Court to define a small depositor as well as a large depositor. The law makes no such distinction and for the Court to do so would require it to fix some arbitrary amount as the dividing line without having any rule or formula to go by. Other Objectors oppose such proposal and support the issuance of scrip to all adult depositors in order to give every adult depositor an opportunity to participate in the beneficial ownership of National.

Whether a depositor-owner receives any scrip does not depend on any arbitrary distinction between small depositors and large depositors, but depends solely on the amount of his deposit balance. The evidence discloses that virtually all of

334

the persons entitled to share in the distribution of the remaining assets of Petitioner will receive scrip. This results from the fact that deposit balances as of the close of business December 31, 1958, were not, with rare exceptions, in exact multiples of $1,000 or even $500. The crediting of dividends to deposits on December 31, 1958, resulted, almost invariably, in a deposit balance with an odd number of dollars. Because the Plan protects each depositor down to the last dollar of his deposit, the issuance of scrip to virtually all depositor-owners is necessary.

The right of depositors to receive Voting Trust Certificates and scrip or scrip only, stem from their Intangible Ownership Interests. The legal rights of all such persons are identical and there is no legal basis for distinguishing between the right to receive a Voting Trust Certificate and the right to receive a fractional interest in a Voting Trust Certificate (scrip). Nor is there any legal theory which would justify the drawing of an arbitrary line between various owners of scrip on the basis of the amount of their deposit or the amount by which their deposit exceeds an even multiple of $1,000.

Each adult depositor has the legal right to decide whether or not he wishes to retain his equity interest. The issuance of scrip protects that right. Any owner who does not wish to purchase the additional fractional interest which, when combined with the scrip distributed to him, will entitle him to a Voting Trust Certificate for a full share, may either keep his scrip for three years or sell it for cash. Thus, each adult depositor may make his own decision instead of having the Court make the decision for him.

In addition to the absence of any legal basis to support a distinction between Voting Trust Certificate holders and scrip holders, the record does not disclose any compelling practical advantage to either the depositor-owners or to Petitioner which would justify the elimination of adult depositors with small balances from participation in the beneficial ownership of National.

It is clear that the persons who are entitled to receive scrip do not constitute a separate class of depositors and it is the opinion of this Court that the provisions of the Plan of Dis-

tribution with respect to the distribution of scrip certificates are desirable and necessary and that said provisions should not be revised.

In view of the fact that the expense of buying, selling and combining scrip through normal brokerage channels would, in most cases, be out of all proportion to the value of such scrip, Petitioner should make provision for the Stock Transfer Department of Society National Bank of Cleveland to act as agent for the holders of scrip certificates who desire either to purchase such additional scrip as, when consolidated, will entitle them to have one full Voting Trust Certificate issued, or to sell their holdings of scrip and have the proceeds remitted to them. No brokerage commission or service charges shall be payable by holders of scrip certificates on such purchases or sales.

The second portion of Issue No. 7 relates to the school savings department depositors. While each school child having a savings deposit in the school savings department of Society had an Intangible Ownership Interest in Society identical to the interest of every other regular savings depositor and is therefore entitled to participate in the distribution of the remaining assets of Petitioner in the same manner and to the same extent as every other regular savings depositor, it must be recognized that such school children, being minors, are subject to all the well-known legal disabilities of such status except as changed by specific statute.

Although Section 1105.08, Revised Code, provides that the relationship between a bank and a minor, in connection with a deposit made by or on behalf of such a minor, shall be the same as if such minor were of legal age, and that a bank shall incur no liability for any transaction with respect to such account because of such minority, such section does not alter the legal disability of a minor with respect to the purchase or sale of securities such as bonds or stocks including Voting Trust Certificates or scrip representing fractional interests therein.

It should also be noted that while the school children constitute more than half, in number, of the owners of Intangible Ownership Interests, their total deposits at the close of business on December 31, 1958, constituted only 2.25% of the aggre-

gate of all regular savings deposits on that date and that more than 123,000 of such school children had deposits of less than $50. The small amounts involved preclude the use of relatively expensive procedures such as a legal guardianship to overcome the legal disabilities of minors. In addition such facts make it unlikely that any substantial number of such depositors would be able to buy sufficient scrip to round out a full share. Moreover, the statutory provisions governing permissible investments by such fiduciaries raise a serious question as to the right of any such fiduciary to retain Voting Trust Certificates or scrip as an investment.

Furthermore, the school savings program has been centered largely in the first through the sixth grades. The problems and confusion which would arise among the teachers and other school authorities, the children and their parents, and Petitioner in connection with the economic and legal problems resulting from distribution of scrip to such school children would be almost limitless.

The Guardian ad Litem for the school children depositors, Petitioner and virtually all Objectors agree that it would be proper and to the best interest of the school savings depositors, Petitioner and all other persons entitled to a distributive share in the remaining assets of Petitioner if the share of the approximately 150,000 school savings depositors were converted to cash. This Court agrees and it is the opinion of this Court that such conversion should be effected.

In order to obtain assistance in determining the fair cash conversion value of the share of the school savings depositors in the assets of Petitioner remaining for distribution, this Court appointed three appraisers to appraise each of the items of tangible personal property owned by Society and National, three appraisers to appraise each of the parcels of real estate and leasehold interests owned by Society and National and three appraisers to appraise the fair cash conversion value of the share of the school savings depositors in the remaining assets of Petitioner. The reports of all the appraisers were made available to Petitioner and Objectors and the appraisers were made available for cross-examination.

This Court has carefully considered said reports and recom-

mendations, all information and data on which said reports were based, together with all other facts and information material and relevant thereto, and it is the opinion of this Court that the fair cash conversion value of the share of such school savings department depositors is Fifteen (15c) Cents for each one dollar of deposit balance at the close of business on December 31, 1958.

Petitioner shall take all steps necessary to prepare and submit to this Court for its approval a plan to effect such conversion and thereafter take all such steps as may be necessary to obtain approval of the necessary regulatory and tax authorities. Among other things, such plan should provide that the amount distributable to each such school savings depositor should: (1) be credited to the account of such depositor in Society National Bank of Cleveland if such account, which was open on December 31, 1958, is still open at the time of distribution; (2) be paid by check to the person or persons entitled thereto if the savings account has been closed since December 31, 1958; and (3) any cash distributable to persons who cannot be located should be deposited with the Trustee of the Trust provided for in connection with Issue No. 6.

Such plan should further provide that the natural guardian of any minor school savings depositor shall have the right to elect to have such minor school savings depositor receive the Voting Trust Certificates or scrip to which such minor would otherwise be entitled and the right to purchase such additional scrip as may be necessary to entitle such minor to round out one full share, by submitting to Petitioner the written approval of such natural guardian.

In the opinion of this Court, the decision to convert the interests of the school savings department depositors to cash suggests that two other provisions of the Plan of Distribution be amended. Under the existing Plan, one one-thousandth of a Voting Trust Certificate for one share of stock of Company is to be issued for each $1.00 of deposit balance. By providing for the conversion of the interests of the school savings depositors to cash, the number of pieces of scrip to be issued will be cut in half. It is the opinion of this Court, therefore, that the Plan should be amended to provide that one five-hundredth,

rather than one one-thousandth, of a Voting Trust Certificate for one share of stock of Company should be issued for each $1.00 of deposit balance. Such a provision will entitle additional depositors to receive full Voting Trust Certificates and will not increase the number of pieces of scrip to be issued. It will have the further advantages of decreasing the per share value of the stock and reducing the cost of buying sufficient additional scrip to round out a full share, thereby enabling additional depositors to retain their equity interest, and broadening the market for such securities. As a consequence of such amendment, it will, of course, be necessary to double the authorized number of shares of Company.

The evidence discloses that many of the notices sent out at the time the Transaction was entered into were returned because addresses were out of date. The Court understands that many accounts are in joint names with provisions that either may draw or for survivorship. It would appear that the issuance of registered scrip would avoid substantial risk of scrip being lost, getting into improper hands or being disposed of by persons who might not have full authority to deal therewith. The conversion of the interests of the school savings depositors to cash greatly reduces the number of pieces of scrip to be issued with the result that issuance of registered scrip is feasible. It is therefore the opinion of this Court that the Plan should be amended to provide for the issuance of registered scrip instead of bearer scrip.

On each of the issues referred to above, one or another of the Objectors have raised additional questions which have not been specifically referred to herein. This Court has considered each of such questions and finds them to be without merit. To make specific comment on each of the large number of questions so raised and briefed would extend this opinion unduly and would serve no useful purpose.

Distribution of Voting Trust Certificates and scrip to the regular savings depositors as of the close of business December 31, 1958, and distribution of cash to the school savings depositors as of the close of business December 31, 1958, shall begin on or before May 30, 1962, unless distribution on such date shall be prevented and made impossible by an appeal of the decision of this Court by any one of the parties to these actions.

Petitioner shall prepare and submit to this Court for its approval a proper Journal Entry making final determination of the seven issues herein considered in the manner herein set forth, specifically reserving, however, jurisdiction to consider, modify and approve all amendments to be made to the Voting Trust Agreement and the Plan of Distribution, as well as the Trust to be created in connection with Issue No. 6. Such Journal Entry shall further reserve to this Court full jurisdiction over all other matters which may hereafter arise in connection with the dissolution proceeding, excepting only the seven issues herein considered. Petitioner shall also prepare and submit to this Court for its approval proper Journal Entries to finally determine the cases numbered 719,114; 721,393; and 721,404, in accordance with this opinion.